## GILMER v. PUBLIC UTILITIES COMMISSION OF UTAH et al.

No. 4351.   Decided June 4, 1926.   (247 P. 284).

1. PUBLIC SERVICE COMMISSIONS. Provisions of Public Utilities Act (Comp. Laws 1917, § 4775 et seq.) must be considered in light of purposes of act.

2. AUTOMOBILES. Public Utilities Commission may regulate operation of motor vehicle carriers, under Comp. Laws 1917, §§ 4798, 4820, 4831, and section 4818, as amended by Sp. Laws 1919, c. 14.

3. AUTOMOBILES. In exercise of police power, state can exclude from public streets or highways all vehicles transporting freight or passengers as common carriers.

4. AUTOMOBILES. State can impose such conditions as it deems fair and just on those using streets or highways for transporting freight or passengers as common carriers.

Certiorari

5. AUTOMOBILES. No one has inherent right to use public thoroughfare and streets as place wherein to conduct a private business.

6. AUTOMOBILES. Permission to use public thoroughfares and streets as place wherein to conduct private business is subject to right to control use in interest of public.

7. AUTOMOBILES. Whether contemplated service of motor vehicle system, operating for profit, is beneficial or justified, rests exclusively with Public Service Commission under Public Utilities Act (Comp. Laws 1917, § 4775 et seq.).

8. AUTOMOBILES. That individual operated stage line before Public Utilities Act (Comp. Laws 1917, § 4775 et seq.) was adopted, did not give him property right which he could transfer without being controlled by act.

9. AUTOMOBILES—CERTIFICATE OF NECESSITY AND CONVENIENCE TO OPERATE MOTOR STAGE LINE HELD NOT TO CONFER RIGHT TO INCREASE SERVICE WITHOUT CONSENT OF COMMISSION. That Public Utilities Commission granting individual certificate of necessity and convenience to operate auto stage line in accordance with commission's rules did not in express terms forbid him to increase number of vehicles or number of trips, did not give him right to increase them without consent of commission.[1]

10. AUTOMOBILES—PUBLIC UTILITIES COMMISSION MAY PREVENT INCREASE OF SERVICE BY HIGHWAY CARRIER INTERFERING WITH ANOTHER UTILITY. When it appears to Public Utilities Commission that increase in number of trips by common carrier using highway will seriously affect ability of another utility, serving partly same territory and partly territory beyond, to render service, commission may interfere to prevent such results.

11. PUBLIC SERVICE COMMISSIONS. If orders of Public Utilities Commission are within its jurisdiction and within reason and not capricious or arbitrary, court cannot interfere.

---

[1]Public Utilities Commission v. Garviloch, 54 Utah, 406, 181 P. 272.
Corpus Juris-Cyc. References:
[1-4]   Carriers 10 C. J. p. 649 n. 42, 45; Statutes 36 Cyc. p. 1110 n. 54.
[5-7]   Carriers 10 C. J. p. 649 n. 45; p. 650 n. 52, 54 New.
[8-11]   Carriers 10 C. J. p. 649 n. 45; p. 650 n. 52, 54 New.
[12-15]   Carriers 10 C. J. p. 649 n. 45.
[16]   Carriers 10 C. J. p. 650 n. 50.
[17]   Carriers 10 C. J. p. 650 n. 47.

224        SUPREME COURT OF UTAH        [June

Gilmer v. Pub. Util. Com., 67 Utah 222

12. AUTOMOBILES—PUBLIC UTILITIES COMMISSION HELD NOT TO HAVE
    EXCEEDED AUTHORITY IN MODIFYING CERTIFICATE OF CONVENIENCE
    AND NECESSITY FOR AUTO STAGE LINE (COMP. LAWS 1917, § 4831).
    Public Utilities Commission *held* not to have exceeded its author-
    ity in modifying certificate of convenience and necessity to oper-
    ate auto stage line, as certificate provided that parties operate
    according to regulations of commission, and Comp. Laws 1917,
    § 4831, expressly gave authority, and common carrier using public
    highway must act subject to right of commission to regulate use.

13. AUTOMOBILES. Common carrier using public highway, who de-
    sires to increase service, must obtain permission from Public Utili-
    ties Commission.

14. AUTOMOBILES. Common Carrier using public highways must
    have permission from Public Utilities Commission, which deter-
    mines extent and character of service.

15. AUTOMOBILES. Common carrier using public highway is protected
    from interference by others desiring to use highway for same
    purpose.

16. PUBLIC SERVICE COMMISSIONS. That order of Public Service Com-
    mission was irregular would not invalidate it under Comp. Laws
    1917, § 4820, providing informality shall not invalidate order of
    Commission.

17. AUTOMOBILES. Public Utilities Commission's refusal to permit
    auto stage line to increase service from one trip a week to one
    trip a day *held* not arbitrary nor capricious.[2]

Original proceeding on writ of review by T. M. Gilmer
against the Public Utilities Commission and others, to re-
view an order of said commission.

AFFIRMED.

*Dey, Hoppaugh & Mark,* of Salt Lake City, for plaintiff.

*Harvey H. Cluff,* Atty. Gen., for the Commission.

[2]Salt Lake City v. Utah L. & T. Co., 52 Utah, 210, 173 P. 556, 3
A. L. R. 715, and United States S. R. & M. Co. v. Utah P. & L. Co.,
58 Utah, 168, 197 P. 902.

*Robert B. Porter,* of Salt Lake City, for Los Angeles & S. L. Ry. Co.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, for Denver & Rio Grande Ry. Co.

*Frederick C. Loofbourow,* of Salt Lake City, for Salt Lake & Utah Ry. Co.

*H. L. Mulliner,* of Salt Lake City, for citizens other than Gilmer petitioning, who appeared before the Commission but not in the Supreme Court.

FRICK, J.

The plaintiff applied for and obtained the usual writ of review for the purpose of reviewing an order of the Public Utilities Commission of the state of Utah, hereinafter, for convenience, called the commission.

To afford the reader a better understanding of what is before this court for review, we deem it necessary to make a brief statement of the proceedings leading up to the particular order that is presented for review.

The record shows that in the year 1918, after the Public Utilities Act went into effect (Comp. Laws 1917, § 4775 et seq.), one Joseph Carling, pursuant to the provisions of said act, made application to the commission for permission to operate an automobile stage line for the transportation of passengers and express between Salt Lake City, Utah, and Fillmore, Utah. A protest opposing the application was duly filed, whereupon a hearing was ordered by the commission. After that hearing the commission made the following order:

"It is ordered that applicant, Joseph Carling, be, and he is hereby, granted a certificate of convenience and necessity, and is authorized to operate an automobile stage line for the transportation of passengers and express, between Salt Lake City, Utah, and Fillmore, Utah.

226        SUPREME COURT OF UTAH        [June

Gilmer v. Pub. Util. Com., 67 Utah 222

"Ordered further that applicant shall file with the commission, and post at each station on his route, a printed or typewritten schedule of rates and charges, together with schedule showing arriving and leaving time, and shall at all times operate in accordance with the rules and regulations prescribed by the commission governing the operation of automobile stage lines."

The record also shows that, pursuant to such order, Mr. Carling filed a schedule of trips and rates with the commission in which he stated that he would operate the stage line "one trip each way a week"; that is, he would make one trip to Fillmore from Salt Lake City and vice versa each week. The record further discloses that in January, 1924, Mr. Carling and the plaintiff herein filed their joint petition or application with the commission wherein they asked the commission for permission to transfer the permit or certificate of convenience and necessity theretofore issued to Mr. Carling to the plaintiff. At the hearing on the application, plaintiff was asked the following questions, which he answered as indicated:

"Q. What service do you contemplate giving between Salt Lake and Fillmore? A. The same service that Mr. Carling is now giving. Q. One trip each way per week? A. The same service that he is giving. Q. Your present proposition is to operate the time schedule and rate schedule of Mr. Carling? A. Yes."

After the hearing, the commission made the following order:

"After full consideration of all material facts that may or do have any bearing upon this case, we are of the opinion and decide that the public will be as equally well served by the applicant, T. M. Gilmer, as the present holder of the certificate, Joseph M. Carling; that Joseph Carling be permitted to relinquish his service; that his application to cancel his certificate be granted; that the same be canceled; that T. M. Gilmer be permitted to succeed him in the giving of said service; and that a certificate of convenience and necessity be issued to the said T. M. Gilmer, authorizing him to give the said service.

"It is ordered that Joseph Carling be, and he is hereby, permitted to relinquish his automobile stage line service, between Salt Lake City and Fillmore, Utah; that certificate of convenience and necessity No. 48 (case No. 148) issued to the said Joseph Carling, be, and it is hereby, canceled.

"Ordered further that T. M. Gilmer be, and he is hereby, granted permission to take over and assume the operations of said automobile passenger and express line between Salt Lake City and Fillmore, Utah, under certificate of convenience and necessity No. 214.

"Ordered further that T. M. Gilmer, before beginning operation, shall file with the commission and post at each station on his route, a schedule as provided by law and the commission's tariff circular No. 4, naming rates and fares and showing arriving and leaving time from each station on his line, and shall at all times operate in accordance with the rules and regulations prescribed by the commission governing the operation of automobile stage lines.

"Ordered further that this order shall become effective January 10, 1925."

Immediately after the foregoing order became effective, to wit, on the 13th day of January, 1925, plaintiff filed with the commission a schedule under which he proposed to make daily trips between Salt Lake City and Fillmore, and with the schedule he filed his application asking the commission to approve the schedule aforesaid. Protests were filed, and the matter was held in abeyance for reasons not material here. On March 31, 1925, the commission entered an order suspending the right to operate the stage line except upon the schedule hereinbefore referred to until the 29th day of July, 1925, or until the further order of the commission. After this there were more protests filed upon which further hearings were had. Finally, on September 30, 1925, the commission made the following order:

"It is therefore ordered that the applicant T. M. Gilmer's schedule P. U. C. U. No. 4, providing for additional automobile stage service for the transportation of passengers and express over the public highway between Salt Lake City and Fillmore, Utah, be not approved, and that the same be and remain permanently suspended, that is to say, until upon a proper showing made before the commission that public convenience and necessity require such additional service; that said schedule P. U. C. U. No. 4, as to rates to be charged, be, and the same is hereby, approved.

"It is further ordered that the order of the certificate of public convenience and necessity No. 214, issued by the Public Utilities Commission of Utah to T. M. Gilmer on the 30th day of December, 1924, in case No. 690, be, and the same is hereby, modified and ex-

pressly limited to conform to and with his time schedule P. U. C. U. No. 3, filed with the commission January 10, 1925, in case No. 767, providing for one round trip each week between Salt Lake City and Fillmore, Utah, being the same service applied for by him and that rendered theretofore by Joseph Carling under certificate of convenience and necessity No. 48 in case No. 148, issued to said Joseph Carling, June 10, 1919."

By a supplemental order, the foregoing order became effective November 1, 1925.

Application for a rehearing was duly filed, which was denied by the commission, and the applicant, within the time required by the Public Utilities Act, made application to this court for a writ of review as hereinbefore stated.

Plaintiff contends that the orders of the commission denying him the right to make daily trips between Salt Lake City and Fillmore should be vacated and annulled. So that there may be no mistake with regard to what plaintiff's counsel are contending for, we here set forth the opening statement as the same is contained in their printed brief. They say:

"Tersely stated, there is here presented, as one of the questions at issue, the following: Must there be a hearing with all the opportunities for delay necessarily resulting, each time a railroad company changes its time tables or a public utility improves conditions for the benefit of the public?"

Upon the other hand, in order to show what counsel for the commission contend for, we here append the opening statement contained in their brief as follows:

"The only questions involved in this appeal relate to the extent of the powers of the Utilities Commission. Can it regulate the practices of common carriers or public utilities? Can it determine what service is reasonably necessary? Can it, in granting a certificate of public convenience and necessity to an automobile transportation company, limit or decide what service will reasonably meet that convenience and necessity? Does it possess the power, after having granted a certificate of convenience and necessity to an automobile transportation company, to supervise and regulate the service that that transportation company may give?"

It now becomes necessary to refer to certain provisions contained in the Public Utilities Act. Comp. Laws Utah 1917, § 4798, where the act as first enacted is found, reads as follows:

"The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, as defined in this title, and to supervise all of the business of every such public utility in this state, and to do all things whether herein specifically designated, or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction."

Section 4818, as amended by Spec. Laws Utah 1919, c. 14, defines what constitutes a public utility, which includes automobile stage lines or automobile or other motor vehicles which are operated for hire or profit on the public highways as common carriers.

Section 4820, Comp. Laws Utah 1917, reads:

"All hearings, investigations, and proceedings shall be governed by this title and by rules of practice and procedure to be adopted by the commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding, or in the manner of taking testimony, shall invalidate any order, decision, rule, or regulation made, approved, or confirmed by the commission."

Section 4831 provides:

"The commission may at any time, upon notice to the public utility affected, and after opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it. Any order rescinding, altering, or amending a prior order or decision shall, when served upon the public utility affected, have the same effect as is herein provided for original orders or decisions.'"

While there are many other provisions in the Public Utilities Act that are material, yet the foregoing, in our judgment, are quite sufficient to make clear the powers that are vested in the commission respecting the supervision, regulation, and control of all public utilities.

In this connection, we also desire to refer the reader to *Public Utilities Comm.* v. *Garviloch*, 54 Utah, 406, 181 P. 272; *Salt Lake City* v. *Utah L. & T. Co.*, 52 Utah, 210, 173 P. 556, 3 A. L. R. 715, and *United States S. R. & M. Co.* v. *Utah P. & L. Co.*, 58 Utah, 168, 197 P. 902, where special provisions of the Public Utilities Act are more fully considered.

In view of the foregoing provisions when considered in the light of the purposes of the Public Utilities Act, as they must be, there can be but little if any doubt respecting the right and power of the commission to regulate and control the operation of auto stage lines or other motor vehicles which use the public highways and streets for the purpose of transporting either freight or passengers as common carriers. Nor is there any doubt that the state in the exercise of its police or governmental powers, may exclude all vehicles that are being used or operated for the purposes aforesaid from the public streets or highways altogether. If that be so, it necessarily follows as a corollary that the state may impose such conditions as it may deem fair and just upon those who use the public streets or highways for the purposes aforesaid. Mr. Spurr, by reason of his position as the editor of the Public Utilities Reports, is no doubt well qualified to speak upon the subject of state control of public utilities. In discussing that subject in volume 1 of his work entitled Guiding Principles of Public Service Regulation, at page 31, the author says:

"What do these provisions of the statutes with reference to certificates of public convenience and necessity signify? As a matter of policy, why should a public utility company require commission consent before beginning operation while those engaged in private enterprises can do business where they will? Public and private industries were once on the same footing in this respect. The maxim that competition is the life of trade was held to apply to public as well as private business. Competition, being thought well of, was welcomed in all kinds of business. Experience proved, however, that business rivalry in the public utility field was bad, both for the companies and the public. So the policy of discouraging rather than encouraging competition between public service companies was adopted."

Certiorari

Pond, in the third and last edition of his excellent work entitled Public Utilities, discusses the subject of regulation of public utilities by the state, through public utility commissions, at considerable length. In view that Mr. Pond covers the very questions involved on this review, we take the liberty of quoting and adopting some of the language used by the author. In section 723, in speaking of the adjustment of the service of motor vehicles operating as common carries, the author says:

"The proper adjustment of the service of motor vehicles operating as common carriers to that of rail and electric carriers is of the greatest importance and requires early attention and practicable and equitable solution. * * *"

Sections 732 and 733 read as follows:

"732. The policy of state regulation of motor vehicles, operating as common carriers, is legislative and administrative, and, having determined on the agency of the state for such purpose, it then becomes the duty of the state to define the operating conditions for this new form of transportation. The general trend of statutory regulation on the subject provides for the issuing of permits of public convenience and necessity through the public utilities commissions. These permits may issue as a matter of course and fairness to such motor systems of conveyance as are operating in good faith when the statutory legislation is enacted, and if such is the policy decided upon by any particular state, it should be expressly enacted in the statute.

"733. On the other hand, if the state decides the matter should be left open to be determined on the merits of each particular case as it arises, the commission should be given discretion in deciding the matter as they must in all new cases arising for their decision. Just when and under what conditions motor vehicle lines should be permitted to enter a field is a business problem, and it should be decided by a competent, impartial body, acting for the state with the question of the public service always outstanding and with future conditions as well as present ones in view."

In sections 754 and 755 the author lays down the following propositions:

"754. The power of the state thus to regulate the use of its public thoroughfares is as fully established and generally recognized as the

232          SUPREME COURT OF UTAH          [June

Gilmer v. Pub. Util. Com., 67 Utah 222

police power itself upon which it is founded. And as it includes the power to prohibit, the conditions of its exercise and enjoyment are subject to the broadest restrictions and regulations consistent with equality and other constitutional property rights. In fact few legal propositions are more fully and firmly established than the right of the state in the exercise of its police power to regulate or prohibit the use of our streets and highways as places of private business, or as the chief instrumentality of conducting such business as that of operating motor vehicle systems for profit.

"755. The power to prohibit includes the power to regulate even to the extent of prohibition, and the reasonableness of the conditions of regulation may only be questioned in the light of constitutional provisions and limitations imposed upon the Legislature. As no one has the inherent right to use the streets and public thoroughfares as a place wherein to conduct a private business, permission so to use them may be afforded certain parties, but always subject to the right to regulate and control their use in the interest of the public and for the common good of all. The public safety and the general business policy of providing public service are logical and necessary questions to consider in determining the nature and extent and in defining the conditions of public regulations and control of motor vehicles operating as common carriers."

In view of what has been said, therefore, there can be no doubt respecting the state's right, when acting through its authorized agent, the Public Utilities Commission, to do precisely what the commision ordered to be done in this case. Moreover, it requires but a moment's reflection to convince the reasonable mind that the foregoing statements are as reasonable as they are just and practical. The public streets and highways must necessarily be under the control and regulation of the state or its authorized agencies. If that be so, then it must follow that the state may regulate and control their use by those who seek to use them as common carriers for private gain. The question, therefore, is not precisely as it is stated by counsel for plaintiff, to which we have already called attention. The question is not whether a common carrier, owning and operating a railroad, which it constructed at great cost on its own right of way, must apply to the commision each time it desires to increase the number of its trains. We are not now dealing

with such a common carrier, and it is not necessary for us to express an opinion respecting the powers of the commission in that respect. We are here dealing with a case where one is using the public streets and highways as a common carrier for private gain, which streets and highways are constructed and maintained by the public, by means of taxation and otherwise. If it be once conceded that one may use the public highways for the purposes aforesaid without the consent of the state, any number may do the same thing, and thus those who seek to use the highways for the purposes for which they are intended may be unduly hampered in their use of them, or may be driven from them altogether. We are not unmindful of counsel's contention that to add one more motor vehicle to those that are now using the highway between Salt Lake City and Fillmore would, in its effect on the highway, be negligible; that is, that no one could seriously be inconvenienced by the addition of two more vehicles each day between those cities, one going and one coming. That, however, is a question for the commission and not for us to determine and to decide. Besides, the question does not depend alone upon whether the addition of two more vehicles daily would unduly congest travel on the highway or not. There is the element of danger which is increased with each vehicle that is added to those that regularly use the highway, and that danger, we all know, is greatly enhanced by the use of heavy trucks and passenger cars upon the highways. Then again, as contemplated by section 4818, supra, it is the duty of the commission to consider the effect that the addition of freight trucks and passenger stages may have upon other common carriers which are operating their own cars and vehicles upon their own tracks and right of way. The statute expressly provides that such matters must be taken into consideration by the commission in granting certificates of convenience and necessity.

It may well be that a railroad company has constructed a railroad from a central point like Salt Lake City to some outlying and undeveloped territory. For a hundred miles of

that distance the country may be well developed and thickly populated, while for another hundred miles or more the country may be sparsely settled and almost wholly undeveloped. The railroad is, however, making it possible to develop and to populate the undeveloped and sparsely settled portion of the country. It does so by drawing upon the income which it derives from the well-developed and thickly settled portion of its line of railroad. Through the thickly populated territory the state later constructs a concrete highway to accommodate those that live in that territory. The auto bus owner now conceives the idea that it would be profitable to operate an auto stage line through the thickly settled portion of the country and over the concrete highway. In order to carry his proposition into effect, he applies to the commission for a certificate of convenience and necessity to operate a stage line as a common carrier once a week. The commission, after investigation, finds that such a service would be expedient and beneficial, grants his request, and issues a certificate of convenience and necessity to him. Within a few days or weeks after the certificate is issued, however, the owner of the stage line increases the service from one trip each way each week to a daily trip each way or to as many trips as he may elect to make. In making the weekly trip he may not seriously have affected the receipts of the railroad, while in making daily trips he may so reduce its receipts as to make it impossible to pay the operating cost of the railroad. Its rates must thus be increased or it must go into the hands of a receiver, while the bus line is reaping a large reward by serving only territory already served by the railroad company. The railroad rates may thus have to be increased to such an extent that those living in the sparsely settled territory can no longer afford to pay the rates, and thus development must cease altogether. The Utilities Act was conceived to prevent just such unfair and destructive competition, and the commission is the agency that is created with power to regulate and to adjust such contingencies when they arise. To a greater or lesser extent such seems to be the condition

which prevails in this case. The commission had all of the facts before it and made its findings, conclusions, and orders accordingly. In view, therefore, that the plaintiff seeks to use the public highways as a common carrier for profit, he cannot complain if he is limited in that use. True he insists that what he is seeking to do is to give better service to those living in the territory through which he operates his motor vehicles. Whether a contemplated service is beneficial or justified, however, is a matter that is left to the judgment of the commission and no one else. The commission has found against plaintiff's contentions in that regard and he must abide by its decision.

The foregoing observation and legal propositions are well supported by the authorities. See *Motor Transit Co.* v. *Railroad Comm.*, 189 Cal. 573, 209 P. 586; *J. E. Sheets Taxicab Co.* v. *Commonwealth*, 140 Va. 325, 125 S. E. 431; *Modeste* v. *Connecticut Co.*, 97 Conn. 453, 117 A. 495; *State* v. *Darazzo*, 97 Conn. 728, 118 A. 81; *Maine Motor Coaches* v. *Pub. Util. Comm.*, 125 Me. 63, 130 A. 866; *Lane* v. *Whitaker* (D. C.) 275 F. 476; *Westhoven* v. *Pub. Util. Comm.*, 112 Ohio St. 411, 147 N. E. 759; *Estabrook* v. *Pub. Util. Comm.*, 112 Ohio St. 417, 147 N. E. 761. Practically every proposition that is urged by plaintiff's counsel in their brief is considered and decided against their contention in the foregoing cases. For example: It is contended that Mr. Carling operated the stage line before the Utilities Act was adopted, and hence that he had acquired a property right which he had a right to transfer to the plaintiff without being controlled by the commission. That contention is fully answered against plaintiff in *Westhoven* v. *Pub. Util. Comm.*, *Estabrook* v. *Pub. Util. Comm.*, and *Lane* v. *Whitaker*, supra. It is further contended that, inasmuch as the commission did not in express terms forbid Carling or plaintiff to increase the number of auto vehicles and the number of trips, he could increase both at his pleasure without obtaining the consent of the commission. That contention is also answered in the case of *Motor Tran-*

*sit Co.* v. *Railroad Comm.,* supra, and in *Lane* v. *Whitaker,* supra, against counsel's contention. True it is that in *Pub. Util. Comm.* v. *Garviloch,* supra, we said that the certificate issued by the commission constituted a "limited franchise." We were there, however, considering to what extent such a certificate, when issued by the commission, protected the holder from interference by another public utility where such interference has not been sanctioned by the commission. Let it be understood once for all, however, that, because we said that the certificate constitute a "limited franchise," such a statement does not enlarge the rights that are conferred under the same. Mere names are not controlling. What we held in the Garviloch Case, however, was that the holder of the certificate could not be interfered with by another utility. We did not hold that the Utilities Commission, when acting within its authority as an arm of the state, could not do so. The latter proposition was not involved, and hence was not considered or discussed. While it is true that the commission did not in express terms limit the number of motor vehicles that Mr. Carling or the plaintiff might operate, the commission did, in all of its orders, provide that they "shall at all times operate in accordance with the rules and regulations prescribed by the commission governing the operation of automobile stage lines." The commission thus placed a strict limitation upon their right to operate contrary to the rules or regulations of the commission, or contrary to the provisions of the Public Utilities Act. Every public utility necessarily must operate in accordance with both the letter and the spirit of the Public Utilities Act and the authorized conditions imposed by the commission. The very purpose of the Utilities Act is to prevent one public utility from destroying another. When, therefore, it is made apparent to the commission that the increase of the number of vehicles or trips by a common carrier which is using the public streets and highways must necessarily result in seriously affecting the ability of another utility to render ser-

vice, or perhaps destroy its ability to do so, where the service is rendered by the other public utility partly in the same territory and partly in territory extending beyond the territory served by the utility first mentioned, the commission undoubtedly may interfere to prevent such disastrous results. The commission was created for that very purpose, and, where its orders are within its jurisdiction and the bounds of reason, and are not capricious and arbitrary, this court cannot interfere.

It is, however, also insisted that the commission exceeded its authority in suspending the operation of the certificate of convenience and necessity as first issued to the plaintiff. There are several answers to that contention: (1) As already pointed out, the order by which plaintiff was authorized to substitute himself for Carling was conditional merely. (2) The Utilities Act (section 4831, supra) in express terms clothed the commission with power to "alter or amend any order or decision made by it." (3) The authorities, if authority were required, hold that under statutes like ours the commission may do precisely what is complained of here. See *Modeste* v. *Connecticut Co.*, supra.

It is argued, however, that, if the commission is permitted to alter or amend former orders, etc., it may result in serious injury to the common carrier affected, since it may prevent him from using his equipment for which he may have expended large sums of money. We have already shown that a common carrier using the public highways may not do so without permission from the commission, and that the commission will determine the extent and character of the service that may be necessary and that the carrier may render. That being so, the carrier always knows the nature and number of vehicles he may employ in the service. We have also held that, in case he has entered upon the service and desires to increase it, he, before doing so, must apply to and obtain permission from the commission. He thus always is advised respecting the use of equipment, and hence cannot be injured. In using

the public highways as a common carrier, he must, however, always do so subject to the right of the commission to regulate him in the use he makes of them. As held in the Garviloch Case, supra, the law protects him from interference as against others who desire to use the highway for the same purpose, but as against the orders of the commision when based upon public necessity and convenience he is not immune.

There is also some complaint that the order of the commission was irregular. If that were so, however, in view of the statute (section 4820, supra) it would not invalidate the order of the commission that is complained of here.

A careful examination of this record convinces us that the commission not only did not act arbitrarily or capriciously, but that its orders affecting the plaintiff are fair, just, and reasonable, and hence should be, and they accordingly are, all affirmed, with costs.

GIDEON, C. J., and THURMAN, CHERRY, and STRAUP, JJ., concur.