# McCARTHY et al. v. PUBLIC SERVICE COMMISSION et al.

No. 6988.   Decided August 25, 1947.   (184 P. 2d 220.)

See 42 C. J., Motor Vehicles, Sec. 121.  Persons or corporations engaged in local transportation of goods as common carriers, see note 18 A. L. R. 1316.  See, also, 9 Am. Jur. 443.

*W. Q. VanCott and Dennis McCarthy*, both of Salt Lake City, for plaintiffs.

*Allen G. Thurman* and *Zar E. Hayes*, both of Salt Lake City, *Grover A. Giles*, Atty. Gen., *E. C. Jensen, J. Elmer Banks, Harry D. Pugsley, Stewart M. Hanson* and *Lynn S. Richards*, all of Salt Lake City, for defendants.

PRATT, Justice.

This case comes before the court on a writ of certiorari to review orders issued by the Public Service Commission (hereinafter referred to as the commission). The plaintiff is a railroad operating through a large part of Utah. The defendants are eight trucking concerns. The Public Service Commission issued to each of the eight defendants a certificate of convenience and necessity to operate as "common carriers of sand, gravel, loose earth, and cement in bulk to and from all points in the State of Utah."

The undisputed facts are these: The defendants are all engaged in the business of hauling sand, gravel, and cement throughout Utah. They have operated in the past mainly within cities and towns under statutory exemption, which covered both common carriers and contract carriers. In every case the sand and gravel is hauled from the closest pit to the point of construction or use, and usually the haul is under 30 miles. The operation methods of all eight concerns seem to be essentially similar. The truckers haul for several building contractors and others who do substantial trucking of sand, gravel, loose earth and/or bulk cement in their businesses. They enter into an individual contract for each job. The rates charged depend on the distances involved, type of roads that must be used, and size of the job. The contracts usually provide for an amount to be paid for waiting time. The defendants furnish the driver and truck with gas and oil.

The defendants voluntarily submitted themselves to the jurisdiction of the commission and requested to be issued the certificates and classified as common carriers. The plaintiff railroad has a certificate of convenience and necessity to operate as a common carrier of sand, gravel and cement in bulk and claims its standing to object to the Public Service Commission's actions because said actions create competing common carriers. There is no doubt that the plaintiff has an adequate interest to appear and protest. State v. Nelson, 65 Utah 457, 238 P. 237, 42 A. L. R. 849.

It is the primary contention of the plaintiff that under the Utah law the Public Service Commission has no power

to classify the defendants as common carriers. The only question we have is: Did the commission by its order convert "private contracts or a mere private business into a public utility or make its owner a common carrier?" *State* v. *Nelson,* cited above 65 Utah at page 462, 238 P. at page 239, 42 A. L. R. 849. Or in issuing these orders did the commission act "arbitrarily or capriciously?" *Gilmer* v. *Public Utilities Comm.,* 67 Utah 222, at page 238, 247 P. 284, at page 290.

Defendants assert that, because they have voluntarily submitted to the jurisdiction of the Public Service Commission, this court should apply different law than we would apply if defendants resisted the jurisdiction. We cannot so hold. As far as classifying defendants correctly is concerned it makes no difference whether defendants object to the classification or some one else objects so long as the party objecting has standing before this court to object.

The U. C. A., 1943 classifies motor carriers as common motor carriers and contract motor carries. Sec. 76-5-13 defines them as follows:

" 'Common Motor Carrier of Property' means any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle from place to place, the property of others who may choose to employ him."

\* \* \* \* \*

" 'Contract Motor Carrier of Property' means any person engaged in the transportation by motor vehicle of property for hire and not included in the term common motor carrier of property as hereinbefore defined."

The defendants have all been *engaged* in the transportation of property for hire. But we can find no evidence in the record which tends to prove that they *have held themselves out* "to the public as willing to undertake for hire to transport." The fact that each of them engages in transportation for hire is not sufficient evidence that they hold themselves out to the public to do so. Such a holding would make it possible to convert all contract carriers into common carriers, a result which obviously is not intended by our code.

There is little or no conflict in the evidence submitted. It seems clear therefrom that defendants do not hold themselves out to the public generally for hire. For example: (By witness M. K. Moffat)

"Q. Now how do the demands come to you for this type of service if there is any demand for it? A. As a rule, before a contract is ever let, we are notified and asked to submit bids on it.

"Q. Do you submit the contractor a bid for the amount of the carrying? A. That's right.

"Q. And upon what basis is that customarily computed? A. A lot of it at the present time on the work here in the city is by the hour. The biggest part of it is by the ton."

(By witness W. H. Harmon)

"Q. State to the commission the nature of how your business arises from time to time. A. Well we would have a telephone call probably from companies, big contractors that we had worked for previously, or if there is a contract let we will get out on the job and see if they need our services on it."

The trend of the testimony is all toward individually negotiated contracts. The evidence before the commission is very similar to the evidence in the very well reasoned case of *Motor Haulage Co.* v. *Maltbie,* 293 N. Y. 338, 57 N. E. 2d 41, 161 A. L. R. 401, wherein it was held that the carrier was a contract carrier. There the court stated in 293 N. Y. 338, 57 N. E. 2d at page 45, 161 A. L. R. at page 407:

"The uncontradicted and undisputed testimony is that Applicant has always negotiated an agreement for even individual shipments and has never undertaken to handle any freight if unable to arrive at some mutually satisfactory arrangement to make the transportation. Applicant has never held itself out to carry for anybody that might call upon it to transport goods. An agreement is made for each individual movement."

The United States Code Annotated, Title 49, § 303 (a) (15), defines a contract motor carrier as follows:

"The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the

transportation * * * by motor vehicle of passengers or property * * * for compensation."

This definition seems to be in conformity with what was meant by the term "contract or private carrier" at common law. *Jones* v. *Ferguson*, 181 Ark. 522, 27 S. W. 2d 96; Pond, Public Utilities, 4th ed., Vol. 3, Sec. 732, P. 1468; *State* v. *Nelson*, 65 Utah 457, 238 P. 237, 42 A. L. R. 849; *Garkane Power Co., Inc.* v. *Public Serv. Comm.*, 98 Utah 466, 100 P. 2d 571, 132 A. L. R. 1490; *Michigan Public Utilities Comm.* v. *Duke*, 266 U. S. 570, 45 S. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105; *Ney* v. *Haun*, 131 Va. 557, 109 S. E. 438, 18 A. L. R. 1310.

The defendants are rendering a private service to their customers. They are not engaged in a public service inviting an indefinite public generally to hire them; nor does the public have a legal right to the use of their facilities. There being no evidence that they have held themselves out to such a public, the action of the commission in classifying defendants as common carriers was error in law and without proper foundation.

Having held that the carrier-defendants here cannot be classified as common carriers on the basis of the type of services they have rendered in the past we now consider whether or not the evidence they presented to the Public Service Commission is sufficient to establish a basis for a finding that there is a public need for the services of a common carrier of sand, gravel, etc.

The applicable provision of our law is Sec. 76-5-18, U. C. A., 1943, which reads:

"It shall be unlawful for any common motor carrier to operate as a carrier in intrastate commerce within this state without first having obtained from the commission a certificate of convenience and necessity. * * * If the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof it may issue the certificate as prayed for, or issue it for the partial exercise only of the privilege sought * * *. Otherwise such certificate shall be denied. * * *"

To comply with the above quoted provision the Public Service Commission must deny the carrier-defendant's applications for certificates of convenience and necessity unless presented with evidence from which it could find that there is a public need for the services of a common carrier of sand, gravel, etc. Was there such evidence? We believe not.

The carrier-defendants offered a great deal of evidence to the effect that there is a great need for the type of service which they render. It would appear that by this evidence they were attempting to qualify under section 76-5-18 quoted above for their certificates of convenience and necessity. Assuming that there is a great need for the type of service the carrier-defendants render, they presented testimony that they had no intention of changing the way they carried on their business. We have explained above that their business as it has been rendered in the past could not be classified as public in nature. Thus the need, if need there be, would not qualify them for common carrier certificates. All the representatives of the public for whom the carrier-defendants served, testified that they were completely satisfied with the service rendered at the present time. We find no evidence that there is a need to change these contract carriers into common carriers.

Section 76-5-21 U. C. A., 1943, provides for the issuance of permits to intrastate contract carriers. The legislature has distinguished between contract motor carriers and common motor carriers. When there is evidence which tends to prove that the public need is for the service of a common carrier, then the commission under Sec. 76-5-18 U. C. A. 1943 has the power to issue certificates of convenience and necessity, and not until then. If the need is for contract carriers, that is not a foundation for action such as was taken by the commission in this case.

The commission should recall the common carrier certificates issued to each of the defendants.

The orders of the commission are set aside.

LATIMER, J., concurs.

WOLFE, Justice (concurring in the result).

I concur in the result.

The writer of the main opinion apparently bases his conclusion on the ground that the evidence is insufficient to establish a basis for a finding that there is a public need for services of a common carrier of sand, gravel and cement. In this I concur as will be seen hereunder. However, I still think the statement that the

"only question we have is: did the commission by its order convert 'private contracts or mere private business into a public utility or make its owner a common carrier?'"

savors of the idea that the commission attempted by mere reclassification to denominate what were really contract carriers to be common carriers. This it did not do or attempt to do.

To entitle an applicant to a certificate of public convenience and necessity as a common motor carrier he must show that public convenience and necessity require the proposed services. Sec. 76-5-18, U. C. A. 1943.

We have had on previous occasions to determine what is meant by the phrase "public convenience and necessity." In *Mulcahy* v. *Public Service Comm.*, 101 Utah 245, 117 P. 2d 298, 301, we said:

"When a utility desires to enter a new field or to render a new or different service, it must, as a condition to receiving a certificate to so perform, show that service sought to be given is one of 'public convenience and necessity.' *Fuller-Toponce Truck Co.* v. *Public Service Comm. of Utah*, 99 Utah 28, 96 P. 2d 722, 724. And in determining whether or not the convenience and necessity of the public will be best subserved by the proposed service, the needs and welfare of the people of the territory or community affected should be considered as a whole. * * * If existing utilities are rendering adequate service ordinarily a certificate will not be granted putting a new competitor in the field. But a service is not necessarily adequate because the community can 'get by,' can conduct its business without further or additional service. To be adequate the services must meet the requirements of the public's convenience and necessities in such a way that the needs, growth, and welfare of the community are reasonably met and supplied. To be adequate they must safeguard the people

generally from appreciable inconvenience in the pursuit of their business, their wholesome pleasure, and their opportunities for growth and development. And if a new or enlarged service will enhance the public welfare, increase its opportunities, or stimulate its economic, social, intellectual or spiritual life to the extent that the patronage received will justify the expense of rendering it, the old service is not adequate."

Quoted with approval in *Union Pacific R. Co.* v. *Public Service Comm.*, 103 Utah 459, 135 P. 2d 915.

This is not a case of a "new competitor in the field" but is one of existing carriers seeking to supply an "enlarged service," i. e., the services of common motor carries in lieu of the services of contract motor carriers. These applicants propose to give a service different in nature from contract carrier service in that they cannot refuse service, must give it at published rates, etc. Whether this in itself will enhance the public welfare is the difficult question in this case.

There is no evidence that past services have not been adequate in the sense that there is not available means of transportation from one point to another. There is no evidence that the "enlarged" or additional services proposed to be supplied by the applicants, that is, common motor carrier services, will "enhance the public welfare, increase its opportunities or stimulate its economic, social, intellectual or spiritual life." According to the witnesses in this case, people who have need for the hauling of sand, gravel and cement have not just been "getting by" with contract motor carrier services but have had "satisfactory" and even "100% satisfactory" service and there is no showing that contract carrier services will not adequately supply future needs. Indeed, there is no evidence that the convenience or necessity of the public to have sand, gravel and cement hauled will in any way be better served by common carrier service than it has been for the past ten or twenty or more years by contract carrier services. A builder who wants sand, gravel or cement hauled from x to y or from one place to another has always had an adequate and satisfactory group offer to perform the service.

As there is no substantial evidence to support the decision of the commission that public convenience and necessity require the proposed services that decision must be set aside.

I do not want my concurrence to be construed as implying that a contract motor carrier could not petition for a certificate of convenience and necessity as a common carrier and that the commission could not grant it such certificate on a proper showing. In the case at bar had the applicants produced substantial evidence that that segment of the public which requires sand, gravel and cement to be hauled was dissatisfied with past services (contract carrier services) and desired *common* carrier services available to haul those commodities they could have shown public convenience and necessity so as to require common carrier services in this field. In such case certificates of convenience and necessity would have been properly granted to the applicants. I do not think the requirement that an applicant for a permit to render services as a common motor carrier must show that public convenience and necessity require such services is the equivalent of saying that such applicant must first show that adequate service of the type required could not be furnished by contract motor carries. I can conceive of situations where an application for common motor carrier service might be supported by a showing that public conveinience and necessity required it where there was not a contract motor carrier operating or offering to operate or where it might still be for the public convenience and necessity even if many contract motor carriers were operating and even operating satisfactorily to a limited extent.

At this time I do not think it necessary to determine whether if contract motor carriers were fully rendering adequate and satisfactory services there might not arise situations in which it would still be advisable for public convenience and necessity that there be motor carriers whose services should be mandatory to the public. My concurrence is on the narrow ground that in this particular case there is no substantial evidence to show public convenience and

necessity to permit or require common motor carrier service in the hauling of sand, gravel and cement.

The following excerpts from the record reveal that the principal desire of these applicants is to be allowed lawfully to operate in the future as they have in the past and that many if not all of the applicants and other participants in the hearings in this case were under the impression and assumed that the only way these applicants and other truckers could continue to haul sand and gravel and cement as they have in the past is to obtain certificates of convenience and necessity as *common* motor carriers:

Commissioner Hacking asked Huber, one of the applicants:

"Mr. Huber, if the commission should conclude that these gravel hauls such as you have been performing are not in the contemplation of the laws of Utah a haul for hire, and the commission should conclude that you should go on in the future as you have in the past without a certificate, would that be satisfactory to you?"

"Huber: That is satisfactory, yes.

"Hacking: So long as they reached the same conclusion with respect to your competitors in the field?

"Huber: That's right.

"Hacking: In other words, I take it that you have been satisfied with the nature of your haul in the past and would be satisfied to continue on without any authority from this commission if the commission didn't bother you, didn't stop you?

"Huber: That's right."

On cross-examination applicant Moffat testified:

"Q. How did you come, then, to file the application? A. Well, it is a law.

"Q. Were you so instructed by the authorities, or did you appear indirectly? A. Well, I read an article in the paper that it was, and then I checked with the commission and found they had passed a law last year.

"Q. You were informed by the Commission it was necessary for you to apply for a certificate? A. They didn't say it was necessary. They said first of May of last year there was a law it was a common carrier."

Applicant Dooley testified:

"Q. Tell us what your reason is for filing this application for a certificate of convenience and necessity at this time. A. In order to continue work like I have been doing.

"Q. You have reached the conclusion that it is necessary for that reason? A. That's correct.

"Q. How did you reach that conclusion? A. I reached that conclusion because other applications had been placed before the commission, and I felt that in order to protect myself I would have to do the same thing."

Crosby, a mining company official whose company has need for truck hauling, testified:

"Q. Will you state to the commission whether or not you desire this [Dooley's] application to be granted? A. I think it is necessary as far as from my standpoint that it is granted, to carry on my operations at the present time and in the future.

"Q. If this application is not granted, do you have in mind who you can get who has a certificate of convenience and necessity to haul your ore? A. No, I haven't."

Cooms, an employee of Morrison-Knudsen Construction Company, testified that that company had frequently hired carriers of sand and gravel and that if the company could not continue to hire such truckers, it would be a "hardship" on the company.

Applicant Gunderson was asked by his counsel:

"Q. Is it uncommon for you to have contracts with more than one contractor in one day? A. No. Sometimes we have six or seven in one day, different contractors to work for.

"Q. Would it be convenient for you to make application to the commission for approval of each one of those contracts each time it came up? A. No.

"Q. Will you state the reason for wanting this certificate of convenience and necessity? A. Well, in the first place, to protect myself so I wouldn't be breaking the law as it is. That's about the only reason, I guess, that there is."

Applicant Nielsen testified on direct examination:

"Q. Now, the question has been asked several times as to why you filed this application. Will you just state so that that question will be answered? A. Well, I was afraid I would be set aside and wouldn't be able to make a living if I didn't have it. That's the whole story.

"Q. And you don't feel that you can operate any better whether you have the permit or whether you don't have it? A. I don't think it will make any difference."

## Applicant Reavely testified on direct examination:

"Q. Why do you ask for a certificate of convenience and necessity? Doesn't a contract carrier's permit fit your situation? A. No, because I might work for seven different contractors in the space of a half a day. In other words, I am holding myself forth as a public trucker. I will have any one of the trucks on seven different jobs working for seven different people in the space of one day."

## On cross-examination:

"Q. When you answered my question that you didn't intend to change your way of business, did you have in mind merely the relations with these other six truckers, or did you have in mind all details of your business? A. Just the business in general, its operating—
"Q. In other words, you have got a going concern operating in a certain way, and you propose to continue it in that same way? A. Yes sir.
"Q. Without change? A. I am trying to do it legally now.
"Q. Trying to get the sanctity of law? A. That's right."

## Mr. Hyde, one of the protestants, asked applicant Reavely:

"Well, is there any necessity for you to have a certificate in this territory?"
"Mr. Jensen (counsel for Reavely): "The Legislature says they can't operate without it, Mr. Hyde." ·
Mr. Hanson (counsel for Nielsen applicants): "No, they haven't."
Reaveley: "Yes, there is. There is a law that says so. Your own Commissioner was the one that informed me of it."
Mr. Jensen: "He is operating. He's got to have a certificate."

Obviously applicants and counsel for some of them were under the impression that if certificates of convenience and necessity are not granted the applicants must either go out of the business of hauling sand, gravel and cement or operate in violation of law or go through the impracticable procedure of obtaining a permit for *each* haul and show a contract before such permit is granted which procedure is not required by the statute. It appears plain that these

applicants for certificates of convenience and necessity rested on a wrong idea of the law.

These applicants are contract motor carriers. The public needs their services as contract motor carriers. I see no reason why general contract carrier permits could not be issued after the required notice and hearing, which general permits would allow these carriers to haul sand and gravel and cement anywhere in the state (or in specific areas, depending on the showing made). The permits could limit the hauls to such distances as would prevent undue competition with satisfactory common carriers of the same commodities in the same area.

If such permits were issued to these applicants they could continue to operate as they have in the past subject, however, to the commission's authority and power to impose insurance and other reasonable requirements on operations under the permits.

There is no statutory provision which prohibits the issuance of such general contract carrier permits. Indeed, where "grandfather rights" to contract carrier permits are concerned such general permits were contemplated by the legislature when it provided in Sec. 76-5-21, U. C. A. 1943, as amended by laws of Utah 1945, Chap. 105:

"The commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the 1st day of January 1940, a permit to operate as a contract motor carrier on the *same highways* and to carry on the *same type* of motor service as he was on said date." (Italics added.)

The "grandfather right" there given was not limited to a particular contract or for hauling for a particular person. If an applicant for a permit showed that before January 1, 1940, he was hauling sand, gravel and cement within *all* the cities of this state and within 15 miles therefrom (so his hauling at that time without a permit would be legal) and that he was hauling for anyone with whom he chose to contract, I hazard the opinion that he would be entitled as a matter of right to a contract carrier permit general enough to enable him to continue to haul gravel and cement

and sand within all the cities of this state and within 15 miles outside for whomsoever he chose to contract. The statute says he is entitled to "a permit" not a series of permits each based on one or more written contracts. The legislature intended such "grandfather" permits to be practicably available and not to be so encumbered with conditions and regulations as to make it so difficult to enjoy that right as to render it of no practical value.

The legislature contemplates a general contract motor carrier permit in an appropriate "grandfather rights" case. The legislature does not prohibit such general permits in appropriate non-grandfather rights cases. I see no reason why an applicant for a "non-grandfather right" permit upon proper showing could not be issued a general contract motor carrier permit, just the same as an applicant for a "grandfather right" permit is entitled to a general permit upon proving the facts which give rise to a general "grandfather right."

Although the legislature gave the commission power to control contract motor carriers it did not require the commission to exercise the close control over contract carriers as it must exercise over common motor carriers. For example, as to common motor carriers the commission

"is vested with power and authority, *and it shall be its duty*, to supervise and regulate all common motor carriers and to fix, alter, regulate and determine just, fair, reasonable and sufficient rates, fares, charges, etc." (Italics added.) Sec. 76-5-17.

However, as to contract motor carriers, while they must obtain a permit, the legislature said:

"The commission is hereby vested with power and authority and it *may* supervise and regulate every contract motor carrier in this state and fix and approve reasonable maximum *or* minimum rates, fares, charges and *classifications*, and to adopt *reasonable* rules and regulations pertaining to all such motor carriers." (Italics added.) Sec. 76-5-24, U. C. A. 1943.

It may be that the public good requires contract motor carriers to certain commodities over certain routes to be

regulated and controlled almost to the same extent as common motor carriers must be regulated. If the commission determines such close regulation of certain carriers is required it has power and authority to impose such regulations. Our statute expressly authorizes supervision of contract motor carriers to practically the same extent as is authorized for common motor carriers—provided the commission determines that such close control is reasonably required. However, merely because the power and authority to regulate contract motor carriers is given that power and authority need not be exercised unless required for the benefit of the public and then only to the extent required. It is for the Public Service Commission to adapt its regulations and practices to fit the different situations to assure continued essential contract carrier services with only reasonable and necessary regulations on such services.

I see no reason why in a proper proceeding motor carrier permits of the general nature mentioned above could not be issued to these applicants and why such permits could not be conditioned upon requirement of insurance, mechanical inspection, and such other requirements as the commission deems necessary and why the applicants could not continue to supply the indispensable service they have supplied adequately and satisfactorily as *contract* motor carriers in the past.

McDONOUGH, Chief Justice, concurs in the opinion of WOLFE, J.

WADE, Justice (dissenting).

I dissent. I concur generally with the concurring opinion of Mr. Justice WOLFE, and with what he says in regard to the kind of permits and the circumstances under which they may be granted to contract carriers. But I am not prepared to hold that before the commission can grant a certificate of convenience and necessity to a common motor carrier there must be a showing that adequate services of the type proposed could not be furnished by contract motor carriers.

This is what I understand to be the narrow grounds on which Mr. Justice WOLFE bases his concurrence.

The services which these applicants proposed to render to the public as common motor carriers are almost identical with the services which they have been rendering in the past and which they could render as contract motor carriers were they to apply for and be granted a permit to do so. Practically the only difference would be that as common motor carriers they would hold themselves out and be obligated to serve any person who may choose to employ them whereas as contract motor carriers they would be able to choose their customers. Of course a common carrier must submit to more detailed regulations by the commission than a contract carrier. But the showing under our statutes which a common motor carrier must make in order to obtain a certificate of convenience and necessity is almost identical with the showing required of a contract motor carrier in order to obtain a permit to so operate.

Sec. 76-5-18, U. C. A. 1943, with respect to a common motor carrier in order to obtain a certificate of convenience and necessity, provides:

"* * * If the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof it may issue the certificate as prayed for, or issue it for the partial exercise only of the privilege sought, and may attach to the exercise of the right granted by such certificate such terms and conditions as in its judgment the public convenience and necessity may require, otherwise such certificate shall be denied. Before granting a certificate to a common motor carrier, the commission shall take into consideration the financial ability of the applicant to properly perform the service sought under the certificate and also the character of the highway over which said common motor carrier proposes to operate and the effect thereon, and upon the traveling public using the same, and also the existing transportation facilities in the territory proposed to be served. If the commission finds that the applicant is financially unable to properly perform the service sought under the certificate, or that the highway over which he proposes to operate is already sufficiently burdened with traffic, or that the granting of the certificate applied for will be detrimental to the best interests of the people of the state of Utah, the commission shall not grant such certificate."

Sec. 76-5-21, U. C. A. 1943, as amended by Sec. 3, Chap. 105, page 209, Laws of Utah, 1945, with respect to granting a permit to operate as a contract motor carrier, provides:

"* * * If, from all the testimony offered at said hearing, the commission shall determine that the highways over which the applicant desires to operate are not unduly burdened; that the granting of the application will not unduly interfere with the traveling public; and that the granting of the application will not be detrimental to the best interests of the people of the state of Utah and/or to the localities to be served, and if the existing transportation facilities do not provide adequate or reasonable service, the commission shall grant such permit."

Under these statutes about the only difference in the requirements to obtain a certificate of convenience and necessity, in order to operate as a common motor carrier, and the requirements in order to obtain a permit to operate as a contract carrier, is that in the former the commission must be satisfied of the applicant's financial ability to render the service sought, and in the latter there is no such requirement. But there is here no claim that the evidence is insufficient in that respect.

As pointed out in *Mulcahy* v. *Public Service Comm.*, 101 Utah 245, 117 P. 2d 289, in order to obtain a certificate of convenience and necessity, there must be a showing that the necessity and convenience is for the benefit of the public generally, rather than that of only a few individuals. Such a showing in this case in my opinion was sufficiently made. The showing here was to the effect that they had been serving the public generally, that wherever there was work to be done of their type they proceeded to do it, and that their services were not confined to a few individuals. I think that the fact that in the past such service has been satisfactorily performed as contract motor carriers, does not prevent the commission from concluding that there is a public necessity therefor. Much of the evidence in my opinion tended to show that the public would be better served by these same carriers as common carriers than it has been in the past as contract carriers. As common car-

riers they will be required to do their work under approved rate schedules which they are not required to do as contract carriers, this the evidence tends to show would be an advantage to the public.

Mr. Justice WOLFE holds as a matter of law that the applicants have failed to make sufficient showing of convenience and necessity for what he calls the increased service of a common motor carrier. The only reason pointed out in his opinion for such holding is that in the past the services rendered by these applicants as contract carriers has been adequate. In my opinion that is tantamount to holding that in all cases if the proposed services can be adequately furnished by a contract carrier then there is not sufficient showing to authorize the commission to grant a certificate of convenience and necessity for a common motor carrier. This I do not think is the correct test. I think that where the services required by the public can be equally as well supplied by the same truckers either as contract carriers or as common carriers, as long as there is a necessity for one or the other then if the truckers desire to operate as common carriers and meet the requirements therefor which are different from those of a contract carrier it is within the discretion of the commission to grant them a certificate of convenience and necessity and we cannot under the circumstances say as a matter of law that no necessity exists therefor.

I therefor think the decision of the commission should be sustained.