In the Matter of MOTOR HAULAGE COMPANY, INC., Appellant, against MILO R. MALTBIE et al., Constituting the Public Service Commission of the State of New York, Respondents.

Argued April 19, 1944; decided July 19, 1944.

*Parker McCollester* and *Frank J. Clark* for appellant. I. One is not a common carrier by motor vehicle under the Public Service Law unless he has undertaken to transport property for the general public. (Public Service Law, art. 1, § 2 [30].) II. There is no undertaking to transport for the general public within the meaning of the statutory definition if a carrier may, with impunity, refuse to transport goods tendered and may select those with whom it will contract, and if its obligation to transport arises solely by reason of express contracts and not by virtue of a public undertaking. The definition of " common carrier " in the statute is plainly designed to be declaratory of the common law and if it were not so the statute would be invalid. (*Anderson* v. *Fidelity & Casualty Co.*, 228 N. Y. 475; *Jackson A. Iron Works* v. *Hurlbut*, 158 N. Y. 34; *Michigan Commission* v. *Duke*, 266 U. S. 570; *Frost Trucking Co.* v. *R. R. Com.*, 271 U. S. 583; *Smith* v. *Cahoon*, 283 U. S. 553; *Belfast Ropework Company* v. *Bushell* [1918], 1. K. B. 210; *Terminal Taxicab Co.* v. *Dist of Col.*, 241 U. S. 252; *Gerhard & Hey, Inc.*, v. *Cattaraugus T. Co.*, 241 N. Y. 413; *The Pawnee*, 205 F. 333.) III. The facts as to appellant's business clearly negative any undertaking to transport for the general public either at common law or within the language of the statute. (*Michigan Commission* v. *Duke*, 266 U. S. 570.) IV. The manner

in which appellant conducts its business brings it squarely within the statutory and common law definition of ".contract carrier " and the Commission's failure so to find was erroneous at law and arbitrary in the light of the evidence. (Public Service Law, art. 1, § 2[30]; *Terminal Taxicab Co.* v. *Dist. of Col.*, 241 U. S. 252; *Film Transport Co.* v. *Michigan Public Utilities Commission*, 17 F. 2d 857; *Ace-High Dresses* v. *Trucking Co.*, 122 Conn. 578; *N. S. Craig Contract Carrier Application*, 31 Motor Carrier Cases 705.) V. One is not a common carrier for the purposes of the Public Service Law unless his business has the characteristics of those previously considered common carriers thereunder and is susceptible of regulation as such. This is not the case as to appellant. (*Anderson* v. *Fidelity & Casualty Co.*, 228 N. Y. 475; *Terminal Taxicab Co.* v. *Dist. of Col.*, 241 U. S. 252; *Ace-High Dresses* v. *Trucking Co.*, 122 Conn. 578.) VI. The majorities both of the court below and of the Commission rested their decisions that appellant was a common and not a contract carrier upon grounds which were erroneous as a matter of law or without support in the evidence. (*Terminal Taxicab Co.* v. *Dist. of Col.*, 241 U. S. 252; *Belfast Ropework Co.* v. *Bushell* [1918], 1 K. B. 210; *Dairymen's Co-Op. Sales Assn.* v. *Public Service Commission*, 177 A. 770; *Marshall* v. *Public Service Commission*, 129 Penn. Super. Ct. 272; *Film Transport Co.* v. *Michigan Public Utilities Commission*, 17 F. 2d 857; *Michigan Commission* v. *Duke*, 266 U. S. 570; *American Trucking Ass'ns.* v. *United States*, 17 F. Supp. 655; *Merchant Truckmen's Bureau* v. *Reardon*, 10 F. Supp. 358.)

*Philip Halpern* and *Samuel R. Madison* for respondents. I. The conclusion of the Commission that the appellant was a common carrier was amply supported by the evidence. (*Terminal Taxicab Co.* v. *Dist. of Col.*, 241 U. S. 252; *Sheets & Sons* v. *Public Utilities Commission*, 124 Ohio St. 343; *Lloyd* v. *Haugh*, 223 Penn. St. 148; *Jackson A. Iron Works* v. *Hurlbut*, 158 N. Y. 34; *Anderson* v. *Fidelity & Casualty Co.*, 228 N. Y. 475; *U. S.* v. *Carolina Carriers Corp.*, 315 U. S. 475; *McKay* v. *Public Utilities Commission*, 104 Col. 402; *Doyle Transfer Co.* v. *United States*, 45 F. Supp. 691.) II. The fact that the appellant does a large part of its business under formal contracts does not

affect its status as a common carrier. (*Clark* v. *Ulster & Delaware R. R. Co.,* 189 N. Y. 93; *Fordham Bus Corporation* v. *United States,* 41 F. Supp. 712; *Doyle Transfer Co.* v. *United States,* 45 F. Supp. 691.) III. The alleged special features of the service rendered by the appellant could not affect the appellant's status as a common carrier. (*Cleveland & St. Louis Ry.* v. *Dettlebach,* 239 U. S. 588; *Clark* v. *Ulster & Delaware R. R. Co.,* 189 N. Y. 93.) IV. The solicitation and acceptance of the so-called miscellaneous business by the appellant, of itself, established the appellant's status as a common carrier. (*Doyle Transfer Co.* v. *United States,* 45 F. Supp. 691.) V. Appellant's status does not depend upon the answer to the appellant's hypothetical query as to whether the appellant could have been held liable at common law for refusal to accept a shipment tendered to it. (*Cornell Steamboat Co.* v. *United States,* 53 F. Supp. 349, 321 U. S. 634; *Anderson* v. *Fidelity & Casualty Co.,* 228 N. Y. 475.) VI. Appellant's contract business is common carriage. (*Cornell Steamboat Company* v. *United States,* 321 U. S. 634.)

CONWAY, J. The appellant, The Motor Haulage Company, Inc. (hereinafter also referred to as Applicant), made application to the Public Service Commission of the State of New York for a permit to operate as a contract carrier pursuant to section 63-n of the Public Service Law. That section provides, in part, that "No person shall engage in the business of a contract carrier by motor vehicle on any public highway in this state unless there is in force with respect to such carrier a permit issued by the commission authorizing such person to engage in such business". Section 63-k is to the same effect but refers to a certificate for common carrier by motor vehicle. Both sections contain so-called " grandfather clauses " providing that carriers in *bona fide* operation on February 1, 1938, were entitled to permits or certificates without further proceedings.

Hearings on the application were held on two days before a principal law clerk. The only witness who gave testimony was a vice-president of Motor Haulage. No one testified on behalf of the Commission and no evidence in contradiction of the testimony was presented. Thereafter a report, which was adopted by the Commission, with one dissenting vote, was submitted by

the principal law clerk. By the Commission's order, the applicant was granted a certificate of public convenience and necessity as a common carrier by motor vehicle for the transportation of " General Commodities:

" From New York City to all points in the following counties: Nassau, Orange, Rockland, Suffolk, Sullivan, Westchester.

" From all points in the following counties to New York City: Rockland, Suffolk."

. The order further provided: " That as operations wholly within the commercial zone of the city of New York, as fixed by this Commission, which are not under a common control, management or arrangement for a continuous carriage or shipment by motor vehicle to or from a point without said zone are not subject to regulation, a certificate is not required therefor."

Thereafter this proceeding was instituted, pursuant to article 78 of the Civil Practice Act. It was transferred to the Appellate Division, Third Department, where by a closely divided court, the conclusion reached by the Commission was upheld.

Public Service Law, section 63-i is entitled " Declaration of policy and delegation of jurisdiction." It is not necessary to quote it here.

Section 63-j, subdivision 2, reads as follows: " 2. The commission may from time to time establish such just and reasonable classification of brokers or of groups of carriers included in the term *common carrier by motor vehicle, or contract carrier by motor vehicle as the special nature of the services performed by such carriers or brokers shall require,* and such just and reasonable rules, regulations and requirements, consistent with the provisions of this article, to be observed by the carriers and brokers so classified or grouped, as the commission deems necessary or desirable in the public interest." (Emphasis supplied.)

Public Service Law, section 2, is entitled " Definitions." Subdivision 30, clause (b) of that section provides: " The term ' common carrier by motor vehicle ' means any person who or which undertakes, whether directly or by lease or any other arrangement, to transport property, or any class or classes of property, for the general public by motor vehicle for compensation, whether over regular or irregular routes, or within a defined territory, including such motor vehicle operations of

carriers by rail or water, and of express or forwarding companies to the extent they are not otherwise included within the provisions of parts one and two of the interstate commerce act of the United States and the laws of this state."

Subdivision 30, clause (d) reads: "The term ' contract carrier by motor vehicle ' means any person, not included in (b) of this paragraph, who or which under special and individual contracts or agreements, and whether directly or by lease or any other arrangement, transports property by motor vehicle for compensation."

Reference has already been made to Public Service Law (§§ 63-k and 63-n). It is not necessary to quote them in full here.

The vice-president-witness of Motor Haulage gave testimony as to the different types of contracts used by the Applicant and in general the *modus operandi* of the corporation. Motor Haulage was incorporated back in 1916 and its equipment consists of 154 motor trucks with capacities ranging from 550 pounds to 15 tons, 69 tractors and 116 semi-trailers with capacities up to 20 tons. Its trucks and semi-trailers embrace the following types of equipment:

1. Station wagons, rack platforms and van body trucks and semi-trailers for general merchandise.

2. Van body trucks equipped with armored cabs and Babaco alarms for transporting valuable products.

3. Insulated van bodies for handling fresh meats.

4. Insulated and heated bodies for handling wines and liquors in the winter time.

5. Winch trucks for handling large and bulky pieces.

6. Bodies equipped with special racks and scaffolding for handling metal car signs.

7. Small delivery trucks for handling express shipments.

8. Reach semi-trailers, 48 feet long for handling aeroplanes.

9. Tank trucks for syrups, liquid sugar, and other fluids.

That list shows the special character of the equipment required for the contract operations.

Motor Haulage is engaged in both interstate and intrastate business. A large portion of its business is interstate. The company maintains two garages in Brooklyn, one in New York City, two in Jersey City and one each in Harrison, Newark

and Long Island City. From its organization, its business has primarily been that of furnishing, under special contracts, trucks for handling and transporting goods and merchandise within a radius of fifty to sixty miles of Columbus Circle, New York City, although trucks operate to some extent to points much more distant.

Approximately 95% of the transportation performed is under contracts of a special nature, the terms of such contracts ranging from one to five years. Those contracts, in most instances, have been secured by taking over the trucking equipment and personnel of industrial and merchandising companies and substituting therefor, under contract, motor haulage service for such companies in lieu of that previously performed by them with their own trucks. Under the contracts, Applicant undertakes to provide identically the same character of service which its patrons formerly provided for themselves by the use of their own trucking equipment and personnel. In order to do that, Applicant is obliged to conduct the operations under each contract as a separate unit. With very few exceptions, the equipment used for transporting the products of a particular patron is exclusively assigned to that patron, so that there is no intermingling of freight on a single truck or unit for several patrons.

At the time of the hearings, Applicant had contracts covering both intrastate and interstate operations with approximately forty-nine customers. In addition, it had contracts with five or six customers covering operations only within the State of New York, although the transportation covered by some of these may be interstate commerce. Applicant's proof included the presentation in evidence and reference to numerous contracts totaling one hundred in number.

The contracts entered into between applicant and its customers do not contain uniform provisions and rates, but vary according to the nature and requirements of the particular customer. They may be roughly divided into the following categories:

1. *Contracts of rental without responsibility.* Under these contracts, Applicant furnishes trucks, with or without drivers, to customers to be used by customers as they may see fit. Applicant assumes no responsibility for goods handled in the trucks.

In some instances it agrees to furnish chauffeurs to operate the trucks. In other instances, the drivers are supplied by the lessee. When chauffeurs are furnished, Applicant is reimbursed by its patrons for their wages. As a general rule the contracts do not specify the nature of the commodities to be transported. The trucks are operated by the lessees in the same manner as if they were owned by them. Applicant usually agrees to maintain the leased equipment in good repair, to maintain personal injury and property damage insurance, and to garage and fuel the trucks. The lessee directs the operation of the vehicles. At the time of the hearings Applicant was a party to seven such contracts, three of which related to intrastate commerce in New York.

Applicant contended and the Commission has held that this type of contract does not constitute transportation subject to the Public Service Law and, therefore, is not subject to regulation by the Commission. Therefore, no issue is presented here as to that phase of the Commission's decision.

A part of the Applicant's operations lies within the New York commercial zone and is therefore exempted from regulation under the statute. [Public Service Law, § 63-i, subd. 3, cl. (c).] The New York commercial zone has been defined by the Commission as embracing the whole of the City of New York and certain towns and cities in Nassau and Westchester Counties, which are contiguous to the City of New York. A part of the operations is interstate and that part is subject to regulation by the Interstate Commerce Commission under the Federal Motor Carrier Act. That Act is similar to the one under consideration.

2. *Rental contracts with responsibility.* Under these contracts Applicant assumes responsibility for goods transported in the trucks leased. The contract does not provide for a detailed description of the territory within which the leased trucks may be operated. Applicant issues no receipts for any goods loaded on the trucks. It does not know what the trucks may be used for or what goods may be transported in them. The routing of the trucks and the nature of the cargo transported is entirely within the direction of the customer. Applicant assumes liability for loss or damage for goods loaded in

the trucks if the customer can prove the loading as to which damage occurs. The majority of the trucks used under these contracts bear the name of the customer. At the time of the hearing, Applicant had nine such contracts, seven of which involve intrastate operations. The Applicant submitted no proof of any operations under these contracts because " We would not be in a position to do so because we don't know what is loaded on the truck or where the truck goes to."

3. *Tonnage Contracts.* Under this type of contract Applicant assumes responsibility for the transportation of goods. Compensation for the transportation services performed is predicated upon a weight, measurement, gallonage or unit basis. Practically all of these contracts contain an agreement to provide special trucks of varying capacities on an hourly or day basis to handle special deliveries or special commodities that cannot be handled in conjunction with the usual run of commodities handled for the concern under contract, or to provide transportation to or from points for which no tonnage, measurement, gallonage, or unit basis rates have been provided in the rate schedule, or where for other reasons, compensation is determined on an hourly basis. They also contain provisions, in most instances, that in the event that the wages of chauffeurs and helpers or taxes of various kinds are increased during the period of the contract, the increase shall be borne by the customers.

The negotiation of these contracts involved an agreement on the part of Applicant to take over the fleets of trucks of the customers that were being operated by them, including the personnel. The Applicant introduced into evidence eighteen tonnage contracts, all but one of which covered intrastate shipments within and without the exempted intrastate area. In addition Applicant introduced into evidence sixteen contracts with steamship and railroad companies. All of the operations under those sixteen contracts are limited to commercial zone operations insofar as they affect intrastate movements. Applicant also had oral contracts calling for special services in addition to transportation. Examples of these special service contracts are (1) the salvaging of damaged airplanes for Grumman Aircraft Engineering Corporation and (2) the perform-

ance of emergency transportation for such companies as the Western Electric Company, the Jersey Bell Telephone Company, and the New York Telephone Company whenever they may require emergency replacement deliveries of equipment and materials that have been damaged due to floods, storms, et cetera.

Ninety-five per cent of the business of Applicant is performed under contracts of the nature described under the aforementioned categories. The remaining 5% is described as *"miscellaneous operations."* Those operations involve transportation of individual shipments which Applicant is requested to perform and the arrangement for which is negotiated by letter or by telephone conversation, subsequently confirmed by letter. In some instances the contract is entirely oral. Transportation of this character is performed between points within a radius of fifty or sixty miles of Columbus Circle, New York City, and to almost any point on Long Island. The uncontradicted and undisputed testimony is that Applicant has always negotiated an agreement for even individual shipments and has never undertaken to handle any freight if unable to arrive at some mutually satisfactory arrangement to make the transportation. Applicant has never held itself out to carry for anybody that might call upon it to transport goods. An agreement is made for each individual movement. The business under these contracts is business outside of Applicant's regular (long term) written contracts. Included in this category are business concerns which, instead of having a regular run of freight, have only intermittent movements. This type of operation is not limited to shippers with whom Applicant already has contracts. These are operations under arrangements made in each instance for the individual operation.

The record also contains a statement summarizing briefly some of the outstanding provisions found in the contracts employed. The purpose of this summary was to point out the special requirements of the various customers. Some of the provisions are as follows:

1. Provision by which Applicant agrees to paint the name of the lessee upon trucks used in performing transportation for it. Under the tonnage contracts 149 automotive units carry the cus-

tomer's name; 14. under rental contracts. Under the tonnage contracts 149 automotive units have the customer's name painted in customer's colors; 20 under rental contracts. About 45% of the trucks carry the names of the customers.

2. Furnishing by Applicant of specially built trucks to fit the peculiar requirements of the commodities transported. An illustration of this service is found in the contract with Swift & Company. The trucks used under that contract were specially built in accordance with the drawings and specifications of Swift & Company and the bodies of the trucks are similar to the bodies that are used by other companies in the same line, which transport similar commodities for Swift & Company. Under that contract, Applicant transports fresh meats and the trucks are equipped with insulated bodies to transport the meat safely at low temperatures. Applicant has the exclusive contract with Swift as far as the Harrison plant is concerned. Although Applicant's trucks leave from Harrison, New Jersey, they may pick up goods for Swift in New York and take them to a customer in New York, or to another branch house. Applicant possesses keys to the premises of the various customers of Swift so that when deliveries are made at night Applicant's employees " open the premises and put the meat in the icebox, close the icebox, and lock up the premises." The men employed by Applicant to handle this type of work must not only be trustworthy but must possess exact knowledge of particular types of cuts of meat.

3. Provisions under which the lessee agrees to pay any increase in the chauffeurs' wages or any increase in taxes, such as unemployment insurance taxes, etc. Practically all of the contracts, other than rental contracts under which no agreement is made to supply chauffeurs, contain provisions of this character.

4. Provisions by which the lessee agrees to pay a stated amount for excess miles over and above the normal mileage upon which the compensation provided for in the contract is predicated.

5. Provisions under which Applicant agrees to equip trucks transporting valuable cargo with protection devices such as Babaco alarms or armored cabs.

6. Provisions by which Applicant agrees to provide trucks for transportation at all times, including Sundays and holidays, and at all hours of the day. Such a provision is found in the Colgate-Palmolive-Peet Company contract. Under that contract Applicant undertakes to provide the company with all the trucks necessary to meet its requirements whatever they may be from day to day — and the company has a great fluctuation in its unit requirements.

Applicant also maintains a fleet of tank trucks for the transportation of beverage syrups, liquid sugar, and other liquids. These tank trucks are equipped with power take-off pumps for the pumping of liquid into tanks approximately twenty-five feet high.

Applicant also transports car signs in trucks which have built-in pigeon hole racks. The signs can be set in position on pins without the necessity of boxing.

Under its contract with the American Express Company, Applicant maintains one truck which is known as the valuables or money truck, and that truck is equipped with a safe and money wagon guard, and it transports money, valuables and securities. It is used in interstate movements.

In addition to the foregoing special features of contracts, varied services are rendered which, although in all cases express provision is not made for their rendition, their performance is nevertheless implied and necessary in order that the terms of the contract may be properly carried out. Some of these are:

1. Handling and delivery of goods at the direction of the lessee in the same manner as if the trucks were owned and operated by such lessee. Thus, the witness Hoffman testified that Applicant took over the chauffeurs, dispatchers and operating personnel of Colgate, as well as its trucks, and performed the service required exactly as Colgate had theretofore.

2. Handling and transporting goods without the issuance by Applicant of receipts or bills of lading, delivery and distribution being made by quantity and kind of product on receipts signed by consignees at the time of delivery.

3. Maintenance by Applicant of its own employees at the plants of its customers to control the flow, routing and the distribution of the products transported.

4. The making of inside deliveries and in many instances that of placing the goods or products on shelves of stores or in storage rooms. Under the Colgate contract, the soap products are taken from the trucks by the drivers and stored in linen rooms of hotels. Under the Swift & Company contract, meats are taken from racks on the trucks and hung in the storage rooms of meat shops.

Hoffman testified that at no time had Applicant ever held itself out to serve all shippers of freight and that if a shipper should drive up to any of the loading platforms at any one of its garage locations and offer freight for transportation as to which no previous agreement had been made, such freight would not be accepted. He testified without contradiction that no exceptions were ever made to that rule and that Applicant never held itself out to serve the public generally. He testified that Applicant " could not do so because with such an undertaking it would have to accept freight when and if offered to it to the extent of its available equipment. This would involve risks of violating its contracts with its contract customers under which it is obligated to provide them with either a specified amount of equipment daily or weekly, as the case may be, or with whatever equipment may be necessary to meet their varying shipping requirements by motor vehicle." The only advertising done by Applicant was a listing in the telephone company's red book, and that, it felt, it was obligated to do because it did work for the telephone company.

We quoted section 2, subdivision 30, of the Public Service Law (*supra*). Under that subdivision, one is not a common carrier unless he *has undertaken to transport property for the general public*. It cannot be doubted that there must be an undertaking to transport property for the general public. The Legislature so provided. There is no testimony in this record that there ever was any such undertaking. The Commission made no finding that the Applicant ever made such an undertaking. The nearest approach to such a finding was the statement in the report of the principal law clerk that " applicant's operations *more closely approximate* those of a common carrier than of a contract carrier." (Emphasis supplied.)

To understand the meaning of the words "undertakes to transport property for the general public " it might be well to

go back to the common-law definition of a common carrier. It will be noted from the following cases that the term " common carrier " was clearly defined at common law, and that the language employed by the Legislature in Public Service Law, section 2, subdivision 30, is similar to that found in the common-law definition.

In fact, we are agreed that the term " common carrier " is used in the statute in its common-law sense.

In *Anderson* v. *Fidelity & Casualty Co.* (228 N. Y. 475) (1920), ELKUS, J., writing for this court, said at page 480:

" The term ' common carrier ' is not of statutory origin. Its meaning is to be found in the history of the law of the early days when means of travel and communication were slow and uncertain and innkeepers and carriers were restrained from the robbery and ofttimes murder of those to whom they offered their hospitality or service, only by the imposition of heavy penalties and responsibility for the safekeeping of their patrons' goods and persons. (*Nugent* v. *Smith*, L. R. 1 C. P. D. 423; *Coggs* v. *Bernard*, 2 Ld. Raym. 909, 1 Smith's L. Cas. 199.)

" With the development in traveling facilities from the post horse to the chaise, the stage coach and to the modern railroad train or steamboat, the term ' common carrier ' has been applied to each new development catering to the public generally, and the strict rules of the old law have been relaxed but little, for with the development came new dangers of a mechanical sort inherent to swiftly-moving machines.    *    *    *  "
And at pages 481–2:

" Definitions are fundamental. Their application to any given state of facts, therefore, must be by analogy. Moore on Carriers (2nd edition, page 19) defines a common carrier as ' one who, by virtue of his business or calling undertakes for compensation to transport personal property from one place to another either by land or water and deliver the same for all such as may choose to employ him; and every one who undertakes to carry and deliver for compensation the goods of all persons indifferently, is, as to liability, a common carrier.'

" A common carrier was defined, in *Gisbourn* v. *Hurst* (1 Salk. 249), to be ' any man undertaking, for hire, to carry the goods *of all persons indifferently,*' and in *Dwight* v. *Brewster* (1 Pick.

50), to be ' one who undertakes, for hire, to transport the goods of *such as choose to employ him* from place to place.'

" In *Bank of Orange* v. *Brown* (3 Wend. 161), Chief Justice SAVAGE said: ' Every person who undertakes to carry, for a compensation, the *goods of all persons indifferently,* is, as to the liability imposed, to be considered a common carrier.' ' The distinction between a common carrier and a private or special carrier is, that the former holds himself out *in common,* that is, to all persons who choose to employ him, as ready to carry for hire; while the latter agrees, in some special case, with some private individual, to carry for hire.' (Story on Contracts, sec. 752-a.) The employment of a common carrier is a public one, and he assumes a public duty, and is bound to receive and carry the goods of any one.

" ' On the whole,' says Prof. Parsons, ' it seems to be clear that no one can be considered as a common carrier, unless he has, in some way, held himself out to the public as a carrier, in such manner as to render him liable in an action if he should refuse to carry for any one who wished to employ him.' (2 Pars. on Cont. [5th ed.] 166, note; *Allen* v. *Sackrider,* 37 N. Y. 341, 342.) " (Italics the court's.)

Judge ELKUS quoted the following from *Jackson A. Iron Works* v. *Hurlbut* (158 N. Y. 34, 38), at pages 482-3: " A common carrier is one who, by virtue of his calling, undertakes, for compensation, to transport personal property from one place to another for all such as may choose to employ him, and every one who undertakes to carry for compensation *the goods of* all persons indifferently is, as to liability, to be deemed a common carrier."

HISCOCK, Ch. J., in a concurring opinion, said at pages 492-3:

" As we well know the vocation of a common carrier of passengers is an evolution from that of a common carrier of goods. Classical definition of the latter is ' any man undertaking for hire to carry the goods of all persons indifferently.' (*Gisbourn* v. *Hurst,* 1710, 1 Salk. 249.) And again,' To bring one within the description of a common carrier he must exercise it as a public employment; he must undertake to carry goods for persons generally and he must hold himself out as ready to engage in the transportation of goods for hire as a business, not as a casual occupation *pro hac vice.*' (Story on Bailments, Sec. 495.)

"In extension of this definition the common carrier of passengers has been with accuracy defined as ' One who undertakes for hire to carry all persons indifferently who may apply for passage. To constitute one a common carrier it is necessary that he should hold himself out as such. This may be done not only by advertising but by actually engaging in the business and pursuing the occupation as an employment.' (Thompson on Carriers of Passengers, p. 26, note 1.)

"The meaning and extent of these definitions of a common carrier are emphasized by recognized definitions of a private carrier. ' Private carriers for hire are such as make no public profession that they will carry for all who apply, but who occasionally, or upon the particular occasion undertake for compensation to carry the goods of others upon such terms as may be agreed upon. They are not common carriers because they do not make the carriage of goods for themselves or others a business and they do not hold themselves out to the public as ready and willing to carry indifferently for all persons any particular class of goods or goods of any kind whatever.' (Hutchinson on Carriers [3d ed.], § 35.) " (See, also, *Allen* v. *Sackrider,* 37 N. Y. 341.)

In *Gerhard & Hey, Inc.,* v. *Cattaraugus T. Co.* (241 N. Y. 413) this court (McLAUGHLIN, J.) said (p. 417): " The difference between a common and a private carrier is well understood. A common carrier of personal property is one who agrees for a specified compensation to transport such property from one place to another for all persons that may see fit to employ him. (*Jackson Architectural Iron Works* v. *Hurlbut,* 158 N. Y. 34; *Stevenson & Co.* v. *Hartman,* 231 N. Y. 378, p. 381.) One is not a common carrier unless he indicates to the public that he is ready and willing to do business for all that may see fit to employ him ' up to the capacity of his facilities.' (*Michigan Commission* v. *Duke,* 266 U. S. 570, p. 577; 2 Parsons on Contracts [9th ed.], 166.) " (Italics the court's.)

In *Lough et al.* v. *Outerbridge et al.* (143 N. Y. 271 [1894]), this court said (p. 276): " A common carrier is subject to an action at law for damages in case of refusal to perform its duties to the public for a reasonable compensation, or to recover back the money paid when the charge is excessive."

As previously pointed out, the provisions of the Public Service Law are closely patterned after those of the Motor Carrier Act. When the Federal Act was under consideration by Congress, Mr. Joseph B. Eastman, then chairman of the Interstate Commerce Commission, testifying before the Senate Committee on Interstate Commerce, said: " A common carrier, under the law as I understand it, holds himself out to serve all shippers of the kind that he undertakes to serve within his territory, who may wish to be served by him. He cannot pick or choose. He has to take them as they come along, provided he has the facilities for them. A contract carrier does not undertake to do that at all. He does not hold himself out to carry for all alike. He is just a trader. He goes out and makes bargains with particular individuals or concerns. Those bargains may be long-term contracts. Some of the large industries employ contract truckers on a long-term basis. Or he may undertake to deal with individuals with respect to specific shipments, making contracts for specific shipments." (Hearings on S1629, S1632, S1635, Part I, 74th Congress, 1st Session, p. 69.)

In the case of *N. S. Craig Contract Carrier Application* (31 M. C. C. [Interstate Commerce Commission Reports] 705; 710), the Commission held that the statutory definitions contained in the Federal Act were declaratory of the common law. In that case, it was said (p. 710) : " We affirm, therefore, the conclusion of the division that the statutory definitions as now amended are essentially declaratory of the common law. In other words, the fact or not of a public holding out remains the final or ultimate test of common carriage."

Article 1, section 2 (subd. 30, cl. d) of the Public Service Law (N. Y.) defines a contract carrier as follows: " The term ' contract carrier by motor vehicle ' means any person, not included in (b) of this paragraph, who or which under special and individual contracts or agreements, * * * transports property by motor vehicle for compensation." Provision (b) referred to in the foregoing definition consists of the definition of " common carrier by motor vehicle." Article 1, section 2 [subd. 30, cl. (i)] reads: " The term ' private carrier by motor vehicle ' * * * means any person not included in the terms ' common carrier by motor vehicle ' or ' contract carrier by motor vehicle ' who or

which transports by motor vehicle property of which such person is the owner, lessee or bailee when such transportation is for the purpose of sale, lease, rent or bailment or in furtherance of any commercial enterprise.''

Under the common law we find the use of the term '' private carrier''. It would appear that the Legislature in using the term '' contract carrier '' intended to embrace the common-law term of '' private carrier.'' In 4 Williston on Contracts, section 1071, it is stated: '' * * * It was formerly the merest truism that there were but two classes of carriers: the private carrier and the common or public carrier. In certain types of carriage there is now developing a further classification by subdivision of the private carrier category, so far chiefly confined to two classes: the ' contract carrier,' carrying on a private contract basis for certain shippers, and the ' private carrier ' who carries its own products or products in which it has a property interest. This development is an outgrowth of legislative attempts to regulate not only common carriers by automobile, but those contract automobile carriers which transport the property of others over the highways for compensation as a regular occupation or business, * * * .''

In Hutchison, Treatise on the Law of Carriers (3rd ed.), section 35, it is stated: '' Private carriers for hire are such as make no public profession that they will carry for all who apply, but who occasionally or upon the particular occasion undertake for compensation to carry the goods of others upon such terms as may be agreed upon. They are not common carriers, because they do not make the carriage of goods for others a business, and do not hold themselves out to the public as ready and willing to carry indifferently for all persons any particular class of goods or goods of any kind whatever; and hence the law does not compel them to accept and carry goods for anybody. Having never professed by their course of business, or in any other manner, to carry for all indifferently, they, unlike common carriers, may refuse at will to carry the goods which may be offered, without incurring any liability whatever, and may carry for one person and at the same time refuse to carry for another. But, being carriers for hire, their reward is regarded as the consideration for the undertaking and the consequent liability; and the trust being for the mutual benefit of the bailor and themselves,

they belong to a different class of bailees from mandataries and incur a greater degree of responsibility."

· Before the enactment of the Motor Carrier Act a " private carrier " was customarily one who did not undertake to carry for the public and whose transportation was done solely through contracts with its various customers. (See *Michigan Commission* v. *Duke,* 266 U. S. 570; *Film Transport Co.* v. *Michigan Public Utilities Commission,* 17 F. 2d 857; *Ace-High Dresses* v. *Trucking Co.,* 122 Conn. 578; *Stevenson & Co.* v. *Hartman,* 231 N. Y. 378; *Anderson* v. *Fidelity & Casualty Co.,* 228 N. Y. 475, 488; *Terminal Taxicab Co.* v. *Dist. of Col.,* 241 U. S. 252.) It is clear under our statute [Pub. Serv. Law, § 2, subd. 30, cl. (d)] that a contract carrier is one who does not undertake to transport for the general public and who transports property by motor vehicle under special and individual contracts or agreements.

The statute defines a common carrier and a contract carrier. Whether the Commission applied the standards set up validly is a question of law. In *Radio Comm'n* v. *Nelson Bros. Co.* (289 U. S. 266, 276), HUGHES, Ch. J., expressed that clearly as follows: " The powers of the Commission were defined, and definition is limitation. Whether the Commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with the legal requirements which fix the province of the Commission and govern its action, are appropriate questions for judicial decision. These are questions of law upon which the Court is to pass. The provision that the Commission's findings of fact, if supported by substantial evidence, shall be conclusive unless it clearly appears that the findings are arbitrary or capricious, cannot be regarded as an attempt to vest in the Court an authority to revise the action of the Commission from an administrative standpoint and to make an administrative judgment. A finding without substantial evidence to support it — an arbitrary or capricious finding — does violence to the law. It is without the sanction of the authority conferred. And an inquiry into the facts before the Commission, in order to ascertain whether its findings are thus vitiated.

belongs to the judicial province and does not trench upon, or involve the exercise of, administrative authority. Such an examination is not concerned with the weight of evidence or with the wisdom or expediency of the administrative action. *Interstate Commerce Commission* v. *Illinois Central R. Co.*, 215 U. S 452, 470; *Interstate Commerce Commission* v. *Union Pacific R. Co.*, 222 U. S. 541, 547, 548; *New England Divisions Case*, 261 U. S. 184, 203, 204; *Keller* v. *Potomac Electric Power Co., supra; Chicago Junction Case*, 264 U. S. 258, 263, 265; *Silberschein* v. *United States*, 266 U. S. 221, 225; *Ma-King Products Co.* v. *Blair*, 271 U. S. 479, 483; *Federal Trade Commission* v. *Klesner*, 280 U. S. 19, 30; *Tagg Bros.* v. *United States*, 280 U. S. 420, 442; *Federal Trade Commission* v. *Raladam Co.*, 283 U. S. 643, 654; *Crowell* v. *Benson*, 285 U. S. 22, 49, 50." If the Commission did not follow the standards then it was not *within the law.* (*People ex rel. N. Y. & Queens Gas Co.* v. *McCall*, 219 N. Y. 84, 87, 88.) Whether a carrier is a contract or common carrier, after considering all the facts which are here uncontradicted, is a question of law. In *Stevenson & Co.* v. *Hartman* (HISCOCK, Ch. J., 231 N. Y. 378), the question whether a carrier was a common or private carrier was treated as one of law. As a matter of law the Commission erroneously construed the meaning of the language of the statute. The uncontradicted testimony was that Applicant was not engaged in transporting property for the general public. There was, of course, as indicated (*supra*), no finding that it was. The service rendered was pursuant to private contracts with customers, in which no one else was interested and no benefit or disadvantage accrued to any other person by the rendition of that service. There was here no holding out by Applicant that it would serve the public indifferently to the limit of its capacity. It made no profession to carry for all, and was under no obligation to take whatever goods might be tendered. It made such contracts as it saw fit and at prices agreed upon. The contracts here were entered into generally after a survey of the customer's trucking needs. In some cases Applicant has taken over the customer's trucks and drivers. Special type services are rendered. An undertaking to transport for the general public would be inconsistent with appellant's contract obligations to its customers.

In view of the facts disclosed here, the language quoted from the two following cases seems particularly apt. In *Frost Trucking Co.* v. *R. R. Com.* (271 U. S. 583, 592) it was said: " That, consistently with the due process clause of the Fourteenth Amendment, a private carrier cannot be converted against his will into a common carrier by mere legislative command, is a rule not open to doubt * * * . It was expressly so decided in *Michigan Commission* v. *Duke,* 266 U. S. 570, 577–578. See also, *Hissem* v. *Guran,* 112 O. S. 59; *State* v. *Nelson,* 65 Utah 457, 462."

In *Michigan Commission* v. *Duke* (266 U. S. 570), the court said at page 577: " * * * One bound to furnish transportation to the public as a common carrier must serve all, up to the capacity of his facilities, without discrimination and for reasonable pay. The act would put on plaintiff the duty to use his trucks and other equipment as a common carrier in Michigan, and would prevent him from using them exclusively to perform his contracts. This is to take from him use of instrumentalities by means of which he carries on the interstate commerce in which he is engaged as a private carrier and so directly to burden and interfere with it. * * * " (See, also, *Film Transport Co.* v. *Michigan Public Utilities Commission,* 17 F. 2d 857; *Smith* v. *Cahoon,* 283 U. S. 553.)

We have not overlooked the case of *Cornell Steamship Co.* v. *U. S.* (321 U. S. 634, 638). In that case, however, the Supreme Court said: " The commission found from evidence offered that Cornell did so hold itself out to the general public. Upon review the District Court held the commission's finding was supported by substantial evidence. The opinions of the commission and the District Court showed the evidence relied on and it is unnecessary to repeat it here. Sufficient it is to say that we agree with the District Court's conclusion."

The opinion of the District Court will be found reported in 53 F. Supp. 349 and on page 352 it was pointed out that: " In making its finding that the plaintiff, pursuant to the Act, is a common carrier, because it held itself out as such, the Commission referred in particular to the testimony of plaintiff's president set forth in the footnote.[4] "

We think that the testimony quoted in footnote 4 completely distinguishes the *Cornell* case from the instant one.

The order of the Appellate Division should be reversed, with costs; the determination and orders of the Public Service Commission here in issue should be set aside and annulled, and the Commission should be ordered and directed to issue to appellant a permit to engage in the transportation as a contract carrier of commodities generally within the territory and to and from the points where the evidence shows it to have been engaged in operation on February 1, 1938, and continuously since that time.

DESMOND, J. (dissenting). The Commission has held that petitioner, as to certain of its operations, is not a " contract carrier by motor vehicle " but a " common carrier by motor vehicle " within the Act which provides for the regulation of motor carriers, and within the Act's definition of a " common carrier by motor vehicle " as one who " undertakes * * * to transport property, or any class or classes of property, for the general public by motor vehicle for compensation * * * " [Public Service Law, § 2, subd. 30, cl. (b)]. No one doubts that the quoted language is a reformulation of the ancient common-law definition. The problem is to apply that definition to the ever-changing methods devised by businessmen to attract and satisfy customers. If there is room for a difference of opinion as to whether a particular method amounts to common carriage, then we had better leave the solution of the problem to the Public Service Commission, which the Legislature has set up and equipped for such tasks.

Petitioner has a great many customers and operates numerous trucks and trailers of different kinds. Despite the real or fancied superiority of its service, it does in fact compete with other truckers within its chosen territory. Although it has never advertised to any great extent, it employs solicitors whose persuasions continually add new customers to its list. But nearly all its trucking, petitioner points out, is done under written contracts or, at least, under special arrangements. It follows, says petitioner, that it has never undertaken to do hauling for " the general public " and so is a " contract carrier " [Public Service Law, § 2, subd. 30, cl. (d)] and cannot be classified as a common carrier. If that circumstance exempts petitioner from the regulation of " common carrier by motor vehicle " which the Legis-

lature has deemed essential in the public interest, then petitioner, though constantly increasing its business and taking on new customers, will be forever immune from the controls imposed on its competitors, so long as it can show a written or oral contract or prior arrangement for every job it does. If that be the meaning of the statute, then the Legislature has left in it a hole big enough for petitioner to drive its trucks through. This court long ago held that neither the fact that a drayman had no " regular tariff of charges " nor the fact that as to each of his jobs " a special price was fixed by agreement " kept him out of the classification of common carrier (*Jackson A. Iron Works* v. *Hurlbut,* 158 N. Y. 34, 37). " Truckmen, wagoners, cartmen and porters who undertake to carry goods for hire as a common employment in a city or from one town to another, are common carriers ", says the opinion in that case.

If petitioner had been organized and if it existed solely to serve one customer or a few chosen customers under fixed contracts, then it would plainly be a contract carrier. If, on the other hand, it made a practice of lining up its vehicles in the public square to await customers, as did the draymen in olden days, then just as obviously it would be a common carrier (*Stevenson & Co.* v. *Hartman,* 231 N. Y. 378.) But to be a common carrier it does not have to cry its wares to the whole public (see *Terminal Taxicab Co., Inc.,* v. *Dist. of Col.,* 241 U. S. 252, 255, wherein Justice Holmes wrote " No carrier serves all the public "). It need only hold itself out publicly to do motor haulage. We think its solicitors do that when they make their rounds looking for new customers, even though they work from a selected list of prospects.

None of the many cases mentioned or quoted from in the majority opinion deny the right of the Commission to classify this particular kind of trucking as common carriage. The most recent authoritative case — and surely the one nearest to ours — is *Cornell Steamboat Co.* v. *U. S.* (321 U. S. 634, April 3, 1944). There the court had before it for review an Interstate Commerce Commission order declaring Cornell Steamboat Company a " common carrier by water " under a statute (U. S. Code, tit. 49, § 902, subd. d) which defined that term as covering " any person which holds itself out to the general public to engage in the transportation by water " et cetera. The company said it was a " con-

tract carrier " because its services were performed " under individual contracts or agreements " (see definition of " contract carrier " in U. S. Code, tit. 49, § 902, subd. e). The company uses thirty-three tugs in towing other craft for various customers. The largest part (some 88%) of the towing is done under time contracts entered into with customers for periods of years. " Arrangements for all its towing services are based on separate agreements " (see 53 F. Supp. 349 for statement of facts.) The three-judge Federal District Court and the United States Supreme Court held that there was substantial basis for the Commission's determination that Cornell Steamboat Company was a " common carrier by water ", despite the " time contracts " and the " separate agreements ". We feel the same way about this case.

RIPPEY, LEWIS and THACHER, JJ., concur with CONWAY, J.; DESMOND, J., dissents in opinion in which LEHMAN, Ch. J., and LOUGHRAN, J., concur.

Order reversed, etc.