PUBLIC SERVICE COMMISSION *v*. LLOYD A. FRY
ROOFING COMPANY.

4-9597                                      244 S. W. 2d 147

Opinion delivered November 19, 1951.
·Rehearing denied January 7, 1952.

*Bailey & Warren,* for appellant.

*James W. Wrape, Glenn M. Elliott* and *Louis Tar-lowski,* for appellee.

PAUL WARD, J.   On November the 29th, 1949, the enforcement officers of appellant, Arkansas Public Service Commission, acting in accordance with their authority and duty, as they saw it under Act 367 of 1941, stopped a truck which bore a Tennessee license and was driven by one J. P. Boshers. The truck [and the trailer attached] had appellee's name on it and [presumably] contained merchandise belonging to or being delivered for appellee. Boshers informed the officers that he owned the truck

but he had leased it to one Frank Whittington who had in turn leased it to appellee and that appellee had employed him to drive it. Thereupon said officers arrested the driver for violation of the aforementioned Act in that neither he nor Whittington held a permit or Certificate of Convenience and Necessity from the Arkansas Public Service Commission. Twice on January 24th and May 2nd, 1950, respectively, three other truck drivers were arrested under the same facts and circumstances and in each instance bond was posted and there has been no trial. Then on June 2nd, 1950, upon application by appellee, the lower court issued a temporary order restraining appellant, its agents and employees from further so interfering with appellee, its drivers and agents. Following this, on June 26th and July 6th, 1950, respectively, two other truck drivers were stopped under the same facts and circumstances but no arrests were made because of the said court order.

After a full hearing on the issues a special chancellor rendered a decree, April 16, 1951, making the temporary order final, from which decree appellant prosecutes this appeal.

It is our view that if the truck drivers are required to have a certificate as stated above then the issuance of the restraining order was erroneous, otherwise it was proper and the case should be affirmed. Under this view and in this opinion we do not consider the status of Whittington in his relation to the provisions of said Act. Again, if the truck drivers are required to have a certificate then it is necessary for us to find that said drivers are *contract carriers* under the provisions of said Act 367. To determine this it becomes necessary to consider the appropriate language of the Act and also the testimony, with the exhibits, introduced in evidence.

Section 5 (a) (8) of said Act reads as follows:

"The term 'contract carrier by motor vehicle' means any person, not a common carrier included under Paragraph 7, Section 5 (a) of this Act, who or which, under individual contracts or agreements, and whether directly

or indirectly or by a lease of equipment or franchise rights, or any other arrangement, transports passengers or property by motor vehicle for compensation.''

A careful reading of the above language gives the impression that the drafters intended the definition of *contract carrier* to be all inclusive and to be proof against easy evasion.

Much of the testimony introduced at the hearing below need not be recounted or considered, under our view of the matter, because the lease agreements between the drivers and Whittington and the lease agreement between Whittington and appellee fairly well establish the relationship of each with the others, so these agreements or leases will be freely referred to hereinafter.

Appellee is a corporation domiciled in Memphis, Tennessee, and is engaged in the manufacture and sale of asphalt roofing products. From its plant in Memphis it sells and distributes its products to customers located in a number of points in Arkansas and other states. About a year previous to the first arrest mentioned above appellee adopted a new policy of delivering its products to customers by means of tractor-trailer equipment, which it leased from Whittington but which was to be driven by its own employees. Apparently Whittington was in the business of leasing tractors and trailers to concerns like appellee but insofar as it affects this case he owned seven tractors and eighteen trailers which he leased to appellee, but he also purported to lease to appellee five other tractors which were owned by the drivers mentioned above as having been arrested or stopped. It is these five owner-drivers that we are concerned with here.

Appellee says it has a right to lease transportation equipment and hire its own drivers and thereby become a private carrier just as it would, concededly, be if it owned said equipment outright, and, as a general proposition, we think this is true. On the other hand, appellant contends that the said lease agreements are not *bona fide* but are in effect a clever attempt to evade the provisions of said Act 367 which requires *contract carriers* to procure a permit from the Commission. The im-

plication of appellee, of course, is that if it is a private carrier then the owner-drivers could not be *contract carriers*.

The lease agreement between the owner-drivers and Whittington in force when the first two arrests were made contains among other provisions, the following:

Whittington (a) is engaged in business of leasing truck tractors and trailers to large industrial concerns; (b) the industrial concerns have their own products and furnish their own drivers and liability insurance; (c) shall have nothing to do with selection, direction or control of drivers; (d) is to lease truck to responsible concerns for long terms; (e) is to pay nine cents per mile as shown by speedometer. The owner-driver of the truck (a) shall be able to obtain and retain employment as driver of his own tractor with the concern to whom Whittington leases it; (b) must own tractor and have sufficient experience to be able to obtain and retain his job during life of lease; (c) must arrange to drive own truck or lease is cancelled immediately; (d) agrees his truck shall be operated in accordance with any written or *oral* agreement between Whittington and appellee; (e) agrees to pay for all gasoline, tires, replacements, repairs, licenses, road mileage tax, and registration fees, provide fire, theft and collision insurance, wash, clean and polish tractor, and paint it in any manner designated by Whittington; (f) agrees that this lease shall be governed to any agreement between Whittington and appellee. The lease agreement provides it shall remain in full force and effect for three years, but also provides *either party may cancel by giving the other five days' written notice*.

It appears that sometime later Whittington changed the form of the lease agreement to be used between himself and the tractor owners, and a copy is contained in the record. It is substantially the same as the one mentioned above except that it does not require the tractor owner to obtain and maintain a job with appellee to drive his own truck, and also the cancellation notice is changed from five to 30 days. Here we note that the name of appellee is not mentioned in any of these leases but we

used it for convenient reference to anyone to whom Whittington might lease the tractors.

In the lease agreement between Whittington and appellee, Whittington agrees to service the tractors in substantially all respects as is required of the owner in the leases mentioned above. This lease runs for a definite period of three years but gives Whittington the right to substitute vehicles and gives appellee the right to secure vehicles from other sources if Whittington cannot furnish them. Whittington testified that in every instance where he leased a tractor from the owner and released it to appellee, the owner was employed by appellee to drive the same. It also appears that Whittington would send the owner to appellee to secure such employment.

In the light of the above we are of the opinion that the driver-owners involved in this litigation were *contract carriers* as defined in the section of Act 367 of 1941 quoted above and that they were therefore required to have a Certificate of Necessity and Convenience from the Arkansas Public Service Commission. It seems to us that the arrangements made by appellee to deliver its own products as set forth above amount only to a clever plan to circumvent the letter and spirit of the law. We could not express this view in better language than was used in the case of *Georgia Truck System* v. *Interstate Commerce Commission*, 123 Fed. 2d 210, where the court in dealing with a similar situation said:

". . . It is true that the contracts, under cover of which the operations were conducted, are in most of their provisions carefully drawn to give color to appellant's claim of renting only, and if the operations had been conducted strictly within that form, there might have been some question whether the operations so conducted were transportation operations within the invoked act. When, however, the contracts are read in the light of the construction accorded them by the parties by the actual operations under them, it is clear that the scheme as a whole is a mere subterfuge, an unpermitted evasion, not a real avoidance of the provisions of the law."

558

It is apparent that appellee seeks to obtain all the obvious advantages of having its products delivered by trucks driven and maintained by the owners thereof without complying with the Arkansas law regulating contract carriers, but if this arrangement is approved and carried to its ultimate possibilities it could have the effect of destroying a sizable industry. The fact that Whittington is interposed between the tractor owners and appellee makes no difference because the two sets of lease agreements are too closely tied together to disguise the real purpose and intent, and because we must look to the status of the owner-drivers and to the nature of the service rendered by them. This view is sustained by *Interstate Commerce Commission* v. *F. & F. Truck Leasing Company*, 78 F. Supp. 13, from which the following is quoted:

"In the court and Commission cases the issue of whether a carrier status subject to regulation on the part of the lessor existed has been determined by how much service which goes with ordinary hauling for compensation was being furnished the shipper in addition to the leased vehicle. Also whether on the whole the dealings and arrangements between the parties indicate that a transportation service was being rendered by the lessor to the lessee rather than simply furnishing for private operation a vehicle to a shipper, and whether the vehicle was being operated by the shipper in the same manner as would normally obtain if he were the owner of the rented equipment."

Also in *United States* v. *La Tuff Transfer Service*, 95 F. Supp. 375, appears this language:

"Motor carrier operations must be *bona fide* and conducted in good faith, without a shadow of subterfuge or attempted evasion of the letter or obligation of the law. Any plan or scheme, whether by purported lease, agency, or other device disguising the true nature of the transportation will be of no avail for that purpose. Where one's object in the transportation of property on public highways is to earn compensation for the use of his equipment and his services, he cannot evade regulation by

execution of leases or other agreements which purport to give the alleged lessee the status of a private carrier."

Other cases expressing similar views are: *Board of Railroad Commissioners* v. *Reed*, 102 Mont. 382, 58 P. 2d 271; and *Louisville Taxicab & Transfer Co.* v. *Blanton*, 305 Ky. 179, 202 S. W. 2d 433, 175 A. L. R. 1329.

Although appellant makes it clear it in no way contends that appellee is subject to said Act 367, yet appellee attempts to show that it is a *private carrier* and therefore it must follow that the owner-drivers, being its employees, could not be subject to the Act. In support of this it is pointed out that it carries said drivers as employees, pays social security taxes on them, extends to them vacation benefits, etc., and has absolute control over them. It is ably urged that the "Primary Business Test" is the proper rule by which appellee's status should be governed, and cites at length from rulings of the Interstate Commerce Commission which it says are not binding but should be persuasive to this court. Among such rulings is cited the case of *Lenoir Chair Co.-Contract Carrier Application*, 48 Motor Carrier Cases 259, and *Schenley Distiller's Corporation-Contract Carrier Application*, 48 Motor Carrier Cases 405. Without finding fault with the "Primary Business Test" rule as explained and applied in cited rulings we think such rule is not the one to apply here, and that said rulings do not control here for the obvious reason that the fact situation obtaining here did not exist there.

Considering alone the wording of the first mentioned lease agreement between the owner-drivers and Whittington it is perfectly clear that the tractors leased to Whittington [and later leased to appellee] were to be driven by the owners, and it is just as clear that the lease of the tractors to appellee was not *bona fide*. In fact it amounted to no effective lease at all because, first, the lease to Whittington terminated when and if the owners were unable to drive their own trucks and, second, the lease could be terminated without cause, on five days' notice. In either event the tractor could be withdrawn from

appellee. This negates the contention of appellee that it was operating under a *bona fide* lease for long periods of time. Little need be said about the second form of lease contract devised after the first arrests were made which eliminated the requirement that the owners should drive the tractors and extended the cancellation time from five to 30 days. In the first place the "thirty days" does not harmonize with appellee's contention of long term lease agreements, and more significant is the fact that in each instance involved here the owner was the driver. Also the fact that the lease form was changed at the time and under the circumstances is itself significant.

For the reasons set forth above the decree of the lower court is reversed, the injunction is dissolved and the cause of action dismissed.

HOLT and GEORGE ROSE SMITH, JJ., dissent.

GEORGE ROSE SMITH, J., dissenting. The case presents a question of fact, and I am not able to say that the chancellor was wrong in deciding it as he did. It is possible for the owner of a truck to lease it to another and then obtain employment as its driver without thereby becoming a contract carrier. If the arrangement is *bona fide,* as it was found to be in *Watson Mfg. Co., Inc., v. Common Carrier Application,* 51 M. C. C. 223, there is no violation of the law.

In the case at bar the arrangements by which the driver-owners are employed by the appellee may or may not have been made in good faith, and I am not willing to say that the mere contracts themselves, without other evidence, amount to a subterfuge. If it were shown that the appellee does not in fact exercise the control over the driver-owners that it normally would exercise over an employee, or if it were shown that the amounts paid for the use of these tractors are such as to be fair compensation for the carriage of goods and not fair compensation for the lease of the equipment, or if some other showing were made to indicate bad faith, then I should agree with the majority. But on this record I think the appellee made

*prima facie* proof of a valid arrangement, and the Commission failed to sustain the burden of going forward with the evidence to show that the arrangement is in fact a sham. I would, however, modify the injunction to make it less broad in its terms.