Argued January 29, reargued June 12, affirmed October 15, 1958

# STATE OF OREGON (Public Utility Commissioner)
## v. O. K. TRANSFER COMPANY et al
### 330 P. 2d 510

*R. B. Maxwell,* Klamath Falls, argued the cause for appellants. On the brief were Maxwell & Goddard, Klamath Falls.

*Robert R. Hollis,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were John R. McCullough, Assistant Attorney General, Salem, and Robert Y. Thornton, Attorney General, Salem.

Before PERRY, Chief Justice, and ROSSMAN, LUSK, WARNER, McALLISTER and SLOAN, Justices.

## WARNER, J.

The State of Oregon, acting by its Public Utility Commissioner,[1] sought and obtained a decree enjoining the defendants, O. K. Transfer Company, a corporation, and A. L. Vincze, its president and manager, from certain transportation operations alleged to be in violation of its several permits issued by the Commissioner. From this decree the defendants appeal.

For convenience we will hereinafter refer to the plaintiff as "the Commissioner" and to the defendants as "the Company."

The Company for sometime past was authorized under a Class A permit (ORS 767.135) to operate as a common carrier of property in intrastate commerce on irregular routes in Klamath and Lake Counties, Oregon.

It also held a Class D permit (ORS 767.115) authorizing it to lease, rent, or otherwise provide,

---

[1] Howard Morgan succeeded Chas. H. Heltzel as Public Utility Commissioner of Oregon on the sixteenth day of January, 1957, and now holds that office.

motor vehicles for temporary use in the transportation of property only at the following places in Oregon: Medford, Eugene, Portland and Klamath Falls. The latter, or Class D permit, is commonly called "U-Drive" authority.

Both permits were issued by the Commissioner pursuant to the Oregon Motor Transportation Code (ORS, ch 767). The Company, however, had no contract carrier permit.

The Company had published and filed with the Commissioner tariffs providing rates applicable to its authorized services as a common carrier.

Shortly after the issuance of the "U-Drive" permit, it transferred its various vehicles and equipment, including all of its trucks and tractors designed for heavy loads, to its "lease and rental" operations.

The Commissioner complains that the Company has rendered carrier services for hire at rates different from those specified in the tariffs filed with the Commissioner and represented itself to the public as being willing and able to transport property from places of business in Medford, Jackson County, Oregon, and in Klamath Falls, Klamath County, Oregon, as such carrier for rates different than those specified in its tariffs on file.

The trial resulted in a decree which restrained the defendants in their activities in the leasing and renting of vehicles, owned or controlled by them: (1) by providing drivers for the vehicles who were in the employ of defendants and subject to defendants' direction, supervision or control; (2) from procuring, or offering to procure, special permits from any governmental agency authorized to issue the same for operation of its oversize or overweight vehicles, unless the application for such permits: (a) disclosed the nature of the

interest of the various parties to the transaction; and (b) unless the application was accompanied with a joint undertaking in the name of lessor and lessee, whenever such undertakings are required by any governmental units or offices; (3) from representing to the public in any manner whatsoever that defendants, in addition to the activities above restrained, were willing and able to procure and provide such special permits issued in the Company's name; and (4) when acting as a common carrier with such vehicles, from rendering transportation service at charges or rates different from those of Company tariffs on file in the office of the Commissioner.

The operations of the Company, which are the basis for the Commissioner's complaint, were accomplished under the imagined protection of its Class D or "U-Drive" permit, under which the Company was not required to file tariff schedules, in contradistinction to its Class A permit, which obligates the Company to abide by its established and filed tariffs.

The sole issue presented is whether the activities of the Company under its Class D or "U-Drive" permit constitute transportation for-hire carrier services.

■ We deem it of little importance in this case whether we declare the Company's operations to be those of a common carrier or contract carrier. Transportation activity of both such carriers is subject to regulation and authorization by licensing under the Motor Transportation Act; both involve transportation for hire. (ORS 767.005(5) and 767.010(1)) If it be found that the Company was in reality operating as a common or contract carrier, then the Company would, in either event, notwithstanding the Company's reliance upon the "U-Drive" permit as a defense, be violating the Motor Transportation Act. For if the Company's

operations as a "lessor" be, in fact, common carrier transportation, for which the defendant Company holds a permit, then its charges will be found to be at variance with its filed tariffs and the routes stipulated in its permit. If, on the other hand, the Company be found to be engaged in the activities of a contract carrier for hire under any of its "leases," it would be operating in violation of the act because it has no permit for such type of transportation.

The Company contends that is was properly exercising its "U-Drive" authority to engage in the business of leasing and renting their vehicles without restrictions as to any filed tariffs or territory. It further claims that in furnishing additional equipment, such as dollies and similar equipment for heavy loads in house moving operations, or furnishing other services, such as drivers, or obtaining permits for its lessees, for an additional charge, it was not functioning as a motor carrier for hire.

The appellants present three assignments of error for our consideration. The first challenges the authority of the trial court to issue the instant injunction under the statute relied upon (ORS 767.465). The second asserts that the court misinterpreted the Motor Transportation Code as a whole. The third assignment represents that the Commissioner failed to sustain the burden of proving the allegations of his complaint.

We now address ourselves to the first assignment relating to the issuance of the injunction.

The first assignment projects a question of construction under ORS 767.465 never before construed by this court. ORS 767.465(1) provides:

"(1) Whenever it appears to the commissioner that any person is engaged or about to engage in

any acts or practices which constitute or will constitute a violation of this chapter, or of any rule, regulation or order issued under this chapter, he may bring an action in the proper circuit court in the State of Oregon to enjoin such acts or practices and to enforce compliance with such chapter, rule, regulation or order. Upon a *proper showing,* a permanent or temporary injunction, decree or restraining order shall be granted without bond." (Emphasis ours.)

■ This assignment urges that the trial court erred in holding that the above statute does not require a showing of irreparable harm and inadequacy of law or other statutory remedy. It is appellants' contention that the words, "proper showing," necessarily include the jurisdictional requirements for injunctive relief commonly found in equity tribunals. In support of this position, they earnestly argue, without citation to any authority, that the legislative intent and purpose behind the statute was to bestow only an alternative remedy on the Commissioner in an extraordinary situation. In other words, that a proper and usual showing of actual harm and the lack of adequate remedy was nevertheless mandatory.

Even though ORS 767.465(1) is silent in this particular, an examination of the specific term in question, i.e., "proper showing," will reveal that such argument is untenable. The word "showing," as similarly employed in the U. S. Emergency Price Control Act, sanctioning injunctive relief, has been construed to mean a proper and adequate disclosure or demonstration appealing to a court of equity rather than a fancied theory. *Bowles v. Eastern Sugar Associates,* 64 F Sup 509, 515 (D Md 1946). The words, "show" or "showing," are said to mean to "make apparent or clear by evidence, to prove." *Coyle*

*v. Commonwealth,* 104 Pa St 117, 133 (1883); Black's Law Dictionary (4th ed) 1549. In the early case of *Spalding v. Spalding,* 3 How Prac 297 (NY 1848), the term "showing" meant only such a disclosure of facts as would satisfy the statute.

Applying this construction of the terms, "show" and "showing," to the synonymous phrase, "proper showing," it is explicit that the legislature did not intend the connotation assigned by defendants. At best, the statute only prescribes the degree of proof demanded of the Commissioner when seeking an injunction rather than a type or kind of proof as contended by appellants. We feel constrained to follow the postulates of the above cases. Accordingly, we hold that ORS 767.465 does not specifically, either directly or by implication, require the Commissioner to show irreparable injury or lack of other remedies in order that he may have injunctive relief against violations of the Motor Transportation Code.

■ At this point, it is significant to note that the remedy here is directed towards conduct criminal in nature. At common law, an injunction was not available to restrain criminal conduct. Thus, it is apparent that the legislature intended to confer upon the courts a special power unfamiliar to the common law. This conclusion lends credence to the Commissioner's position that injunctive relief under ORS 767.465, supra, is not conditioned upon common-law requirements, but solely upon the terms of the statute.

Turning to case authority construing similar state and federal legislation, we find unanimous and overwhelming support for the proposition that the usual equitable grounds for relief, irreparable injury and inadequacy of other remedies, are not necessary in these special statutory proceedings. It is enough if

the statutory conditions are made to appear. *American Fruit Growers, Inc. v. United States,* 105 F2d 722 (9th Cir 1939); *Henderson v. Burd,* 133 F2d 515 (2d Cir 1943); *Brown v. Hecht Co.,* 137 F2d 689 (DC Cir 1943), reversed on other grounds 49 F Sup 528 (DDC 1943); *Securities and Exchange Commission v. Torr,* 15 F Sup 315 (DNY 1936), reversed on other grounds 87 F2d 446 (2d Cir 1937); *Securities and Exchange Commission v. Jones,* 15 F Sup 321 (DNY 1936); *Fleming v. Salem Box Co.,* 38 F Sup 997 (D Or 1940); *Walling v. Builders' Veneer & Woodwork Co.,* 45 F Sup 808 (D Wis 1942); *United States v. Beatty,* 88 F Sup 646 (SD Iowa 1950); *Hammerberg v. Leinert,* 132 Conn 599, 46 A2d 420 (1946); 43 CJS 446, Injunctions § 23; 28 Am Jur 243 (App 80), Injunctions § 47. See, also, *United States v. City and County of San Francisco,* 310 US 16, 60 S Ct 749, 84 L ed 1050 (1940); *United States v. Adler's Creamery, Inc.,* 107 F2d 987 (2d Cir 1939); *Kautz v. Sheridan,* 118 Me 28, 105 A 401 (1919). Proof of actual harm and lack of adequate remedy is irrelevant and unnecessary notwithstanding the customary determination of these cases upon equitable principles. *Brown v. Hecht Co.,* supra (49 F Sup at 528).

The law applicable under ORS 767.465(1) was first stated in the Torr and the Jones cases, supra. In *Securities and Exchange Commission v. Torr,* supra (87 F2d at 450), the court held: "As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear."

In *Fleming v. Salem Box Co.,* supra (38 F Sup at 998), Judge James Alger Fee indicates that statutory

injunctions can issue without the showing traditionally required in equity courts. This is especially true where a governmental agency is authorized to seek the injunction in protection of the public interest.

The same distinction is observed in *United States v. Beatty,* supra (88 F Sup at 651), where the court says: "The right of the United States or any agency thereof to obtain an injunction provided for by statute stands upon a different footing than a private party's right thereto, the distinction being that instead of a procedural mechanism for the protection of private rights, the statutory injunction is for the purpose of effectuating Congressional policy and vindicating public rights. Hence, the traditional equity concepts for the issuance of injunctions do not apply. The conditions upon which statutory injunctions shall issue are solely those provided by the statute in question, * * *." See, also, *Walling v. Builders' Veneer & Woodwork Co.,* supra.

Although the above distinction is gleaned from federal cases dealing with federal statutes and Congressional intent, we deem these cases, notwithstanding, analogous and applicable and as persuasive in consideration of the problem at hand under ORS 767.465, supra.

It is apparent that a violation of that statute, if found to exist, is sufficient grounds for the issuance of injunctive relief. As was stated by the court in *United States v. City and County of San Francisco,* supra (310 US at 31): "The equitable doctrines relied on do not militate against the capacity of a court of equity as a proper forum in which to make a declared policy * * * effective."

In the instant case, the applicant for the injunction is an agency of the state, the Public Utilities Com-

missioner, who is presumptively seeking an injunction in the public interest. At least there is nothing to the contrary appearing in the record. On the other hand, the record is replete with appellants' practices alleged to be in violation of ORS, ch 767. If these charges are meritorious, it is of little import that the Commissioner has neglected to prove irreparable harm or injury and lack of another adequate remedy as a result of appellants' alleged practices.

■ Nor is it of any note that the Commissioner can avail himself of other remedies found in ORS 767.190, 767.470, and 767.990. None of these remedies offer the speed or the efficiency of judicial intervention for the protection of a public interest as does an injunction.

The appeal and propriety for injunctive relief is found in the language of *Securities and Exchange Commission v. Lawson,* 24 F Sup 360, 365 (D Md 1938), where the court observes: "* * * Not only the language of the statute but the fundamental purposes * * * can only be gratified by a definite decree of the court which adjudicates the illegality of the practice in the past and enjoins the defendant from repetition thereof in the future. Injunction in such matters is evidently an important feature of the legislation for the protection of the public in the future. * * *" Indeed, the act itself does not establish the injunction of ORS 767.465 as a mere complementary remedy. The authority for an injunction there found is clearly complete and unrestricted.

The defendants' brief urges that the court "balance the equities" as proffered by them. We find no merit in the argument. See *Brown v. Hecht Co.,* supra (137 F2d at 692): "* * * In order to justify the granting of an injunction under an express and unrestricted

statutory authority, no balancing of equities is necessary * * *."

We conclude that the learned trial court did not commit error in granting the injunction against appellants without a showing of irreparable harm or inadequacy of other remedies.

Before proceeding to consider the Company's further assignments of error, it is, we think, worthy of note that the problem here presented for resolution, while one of first impression in this court, is but a part and parcel of a larger and growing problem in the field of motor transportation as it now exists throughout the United States. It has already confronted and vexed both the federal and other state courts. This statement is confirmed by the growing volume of decisions addressed to the subject which in number bear a relationship to the increasing use of motor vehicles carrying types of freight which in times past were the burden of transportation-for-hire carriers.

The reported cases are replete with examples of various and ingenious methods employed by many motor vehicle owners engaged in the business of motor transportation designed to escape the burdens and limitations of laws and regulations limiting their operations as common carriers or contract carriers. Different methods are employed from time to time to circumvent restrictions to certain routes or areas, to avoid adherence to filed tariffs and to obviate the responsibilities that a carrier for hire normally has to assume.

A frequently-used method for such avoidance by those who seek to enjoy the fruits of transport for hire without assuming its incident duties and legal obliga-

tions, is by recourse to a pretended form of leasing arrangement, whereby the vehicle owner ostensibly rents or leases his vehicles to the shipper.

■ There is nothing illegal per se in a leasing of an owner's equipment to one who seeks to use it and operate it as his own. Indeed, our law gives it recognition by authorizing bonafide transactions by those holding a "U-Drive" permit issued by the State Public Utilities Commissioner.

But when what would normally be common or contract carrier contracts for transportation have been invested with the mere form of a rental or leasing operation under the vehicle owner's imagined protection of a "U-Drive" permit, the so-called rental or leasing investiture has been consistently held to be a device and subterfuge behind or under which the owner in substance and reality operates a transportation business for hire.

Our review of the cases in point, which follow both federal and state, warrants the observation that the spurious schemes, when discovered, should be restrained because they directly affect the regulatory patterns of federal and state motor transportation acts, the public interest in necessary services and the economic stability of the bonafide transportation industry.

■ The Company's second and third assignments argue for a construction of the Oregon Motor Transportation Code (ORS, ch 767) that would evince a legislative intent of "hands-off" in regard to the business of leasing and renting motor vehicles under a "U-Drive" operation. It is true an examination of that code does not reveal any regulations or grant regulatory power to the Commissioner that are peculiar to the business

of leasing vehicles. ORS 767.115① merely provides that those entering this business must obtain permits and insurance. But it is quite another thing to hold, as the Company urges, that the legislature, by the enactment of ORS 767.115, supra, intended to acquiesce in the rendition of common or contract carrier transportation services for hire under the guise and veil of a leasing or "U-Drive" permit in any manner which would avoid the authority which the Commissioner exercises over common and contract carriers. This is the cardinal consideration thrust upon the court by this appeal.

The Oregon Motor Transportation Code (ORS, ch 767), supra, taken as a whole, represents the state's transportation policy. It defines, permits, taxes, limits, and regulates certain motor carrier activities in this state. Nowhere, either from a reading of the act or its history, can it be found or implied that ORS 767.115 or any other provisions of the code applying to lessors of motor vehicles were designed to render nugatory the time-honored regulations and rates prescribed for other types of carriers under the act.

Indeed, ORS 767.115 must be read as an integrated part of the entire Motor Code, being, as it is, but one section, having its origin in the comprehensive Motor Code, adopted by the legislature in 1947 (Oregon Laws 1947, ch 467).

We think it is not logical to assume that the legislature would suffer a possible disruption of the state's long-established transportation policy by allowing

---

① ORS 767.115. "No person having his place of business located within this state shall engage in the business of leasing, renting or otherwise providing motor vehicles for the temporary use of others in the transportation of property, or for the transportation of persons in vehicles having seating accommodations for more than seven passengers, upon the public highways of this state, without first obtaining from the commissioner a permit covering such operation and filing with the commissioner an insurance policy as provided in ORS 767.195."

licensed vehicle rental agencies to operate unrestricted as for-hire carriers in a restricted field; that is, the field of transportation exclusively reserved for for-hire transport.

In the area of common and contract carrier activity, special types of permits prevail, issued under specified circumstances and dictating that the "transportation-for-hire" permittee must operate under limiting statutes and appropriate Commissioner regulations designed for public protection. None of these so limit or circumscribe a bonafide leasing or rental business of one operating under a "U-Drive" permit. We, therefore, repudiate the suggestion that this section permits the performance of common-carrier or contract-carrier services by "U-Drive" permittees under the authority of their vehicle rental licenses.

When we turn now to the heart of these two assignments, we are confronted with the question whether the defendants have, in fact, been furnishing carrier service for hire at cut-rates under the guise of a licensed rental agency of motor vehicles.

The frequently-cited case of *U. S. v. LaTuff Transfer Service, Inc.*, 95 F Sup 375 (1950), outlines the comprehensive character of the determination which is to be made in resolving the problem presented by this appeal. At pages 379-380 it is stated as follows:

> "In determining whether the lessor of motor vehicle equipment is engaged in transportation subject to regulation under the Interstate Commerce Act, all services rendered or supplied, and acts performed by the lessor, along with the naked equipment, become of controlling weight in determining the status of the lessor. The amount of this service determines whether the lessor is a 'carrier' or is engaged in the private business of operating a truck rental agency."

Our examination of the record in connection with the Company's so-called leasing operations, reveals: (a) that in most instances it actually furnished the drivers, paying their wages, social security taxes and making the usual payroll deductions and that this was its consistent practice when its heavy trucks were in use; (b) that prior to the filing of the complaint in the instant matter, it suffered the Company's trucks in its ostensible leasing operations to carry the common carrier plates issued by the Commissioner pursuant to ORS 767.175 instead of the "U-Drive" plates issued pursuant to the same section, a confusing practice, casting doubt on the verity of the Company's representations of regularity; (c) that when its customer "renter or lessee" was required to secure special highway permits for movements of Company vehicles when the transport was in excess of the normal height, width, length or weight regulations (see ORS 483.502), the Company would make application therefor in its own name, without disclosing the customer-lessee interest and as a part of such transaction, used its own indemnity bond, whereas, a true lessee was required by ORS 483.502, supra, to obtain such permits, subject to the possibility of providing insurance as set out in ORS 483.528(2), and thereby denying to the Commissioner an opportunity to insure adequate public protection; (d) that for these services the Company charged a flat and arbitrary fee and as testified to by the defendant Vincze, often below and often above, those charged by common carriers for the same movements and charged without apparent regard to its tariffs filed with the Commissioner; and as the trial court found and as we find, (e) the Company held itself out to the public as willing and able to transport property for hire and render such

services at rates less than those specified for such service in tariffs on file with the Commissioner.

Upon these facts, can the Company be charged with providing transportation for hire at cut rates under a rental agency permit and in violation of our code? For the reasons that follow, we think it can.

It is not always an easy task to readily distinguish between a carrier transportation "for-hire" and one which is a bonafide leasing or rental transaction of the "U-Drive" type. There is no certain yardstick to aid us. Each case must be determined according to its own particular circumstances.

There are, however, some recognized and well-established criteria to be found in federal decisions to apply in test. There are also many opinions from the appellate courts of other states, and which, in the main, rest upon the conclusions found in the federal reports. In the absence of either statutory or case authority in point in this jurisdiction, we first reach for the federal and state cases which have met and resolved the questions which now confront us.

In the federal field, we find the Federal Motor Carrier Act (49 USC § 301 et seq.) uses definitions similar to those found in the Oregon Revised Statutes. Turning to 49 USC § 303(14), we find:

> "The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, * * *."

The comparable section in the Oregon Code is ORS 767.005(5), reading:

> " 'Common carrier' means any person who transports for hire or who holds himself out to the

public as willing to transport for hire, compensation or consideration by motor vehicle, persons or property, or both, for those who may choose to employ him."

In the area of transport by contract carriers who also render services for hire, we find a similar accord in definitions. Under the federal code a "contract carrier" in 49 USC § 303(15) is defined as follows:

"The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation."

Under our code ORS 767.010(1) is the counterpart to the federal section. It reads:

" 'Contract carrier' means any person engaged in the transportation by motor vehicle of persons or property, or both, for compensation, under special and individual agreements, leases or other arrangements, and not included in the term 'common carrier.' "

Early in the beginning of lease-rental operations, the Interstate Commerce Commission, in 1940, formulated a broad test to determine whether a given lease effectually removes the lessor from the possibility of classification as a common or contract carrier. This is reflected in H. B. Church Truck Service Co. Common Carrier Application, addressed to the Interstate Commerce Commission, wherein the Commission's ruling is reported in 27 Interstate Commission Reports (Motor Carrier Cases) 191. There the Commission states the proposition as follows:

"With reference to the leased-truck operations, the first question presented is whether the opera-

tion is that of applicant, as the performance of transportation for hire, or whether it is private carriage, performed by the shipper. The line of distinction between the two is not always clear. Essentially the issue is as to who has the right to control, direct, and dominate the performance of the service. If that right remains in the carrier, the carriage is carriage for hire and subject to regulation. If it rests in the shipper, it is private carriage and not subject to regulation except to the limited extent provided in section 204 (a) (3). The question as to who has the right to control and direct must be answered in the light of all the facts and circumstances surrounding the transaction between the carrier and shipper, and of the actual practices in the conduct of the operation thereunder. No one element of such facts and circumstances is by itself conclusive." (H. B. Church Truck Service Co. Com. Car. Application, supra, at 195)

This standard was crystalized into a guiding judicial principle in *U. S. v. LaTuff Transfer Service, Inc.*, supra (95 F Sup 375), where the court, at page 380, said: "The decisive question to be determined is how much service, if any, in addition to the vehicle alone, may be rendered to the shipper-lessee by the owner-lessor before the borderline between renting and leasing a truck for private carriage is crossed and the broad and all-inclusive field of transportation occupied." See, also, *Bridge Auto Renting Corporation v. Pedrick,* 174 F2d 733 (2nd Cir 1949), cert. denied 338 US 850, 70 S Ct 94, 94 L ed 521 (1949); *Interstate Commerce Commission v. F. & F. Truck Leasing Co.,* 78 F Sup 13 (1948); *Interstate Commerce Commission v. Isner,* 92 F Sup 582 (1950); *Interstate Commerce Commission v. Werner,* 106 F Sup 497 (1951).

Additional judicial expressions of the same tenor

are found in many federal cases as are illustrated by the following statements: "* * * The actual nature of the operations is necessarily determinative of the status of an ostensible lessor and the applicability of * * * the Interstate Commerce Act." *Empire Box Corp. v. Willard Sulzberger Motor Co.*, 104 F Sup 762, 766. *Interstate Commerce Commission v. F. & F. Truck Leasing Co.*, supra (78 F Sup at 19), propounds the same proposition with this very pertinent question: Was "* * * the vehicle * * * being operated by the shipper in the same manner as would normally obtain if he were the owner of the rented equipment?"

■ The very frequently-cited case of *Interstate Commerce Commission v. F. & F. Truck Leasing Co.*, supra, is one of special interest because of the criteria it employs (at page 19) for distinguishing a true rental agency transaction from the activities of a motor carrier. These, however, do not need to concur in each given case, as is demonstrated by some of the federal cases previously referred to and to which later reference is made. The F. & F. Truck Leasing Co. case, supra, and other decisions which follow portray the factors emphasized as determinative. No one nor any particular number of factors are controlling, but some of them when appearing together are clearly sufficient to cast the ostensible lessor into the carrier class. Indeed, it will be discovered from many of the federal cases the fact that the drivers are chosen or employed by the vehicle owner is alone sufficient to remove the transaction from a true "U-Drive" status and denominate it one of public carrier service.

As a corollary to the oft-quoted and applied standard, the federal courts have accordingly regarded substance rather than form. *Georgia Truck System, Inc. v. Interstate Commerce Commission*, 123 F2d 210

(5th Cir 1941); *Interstate Commerce Commission v. Gannoe,* 100 F Sup 790 (1951); *United States v. La-Tuff Transfer Service, Inc.,* supra (95 F Sup at 381). See, also, *United States v. Steffke,* 36 F Sup 257 (1940); *United States v. Canada,* 105 F Sup 126 (1951); *Interstate Commerce Commission v. Isner,* supra (92 F Sup at 582); *Empire Box Corp. v. Willard Sulzberger Motor Co.,* supra (104 F Sup at 762). All are cases involving "leases" held to be mere artifices utilized in attempted evasion of the act.

We again turn to *United States v. LaTuff Transfer Service, Inc.,* supra (95 F Sup at 381), where we read with approval:

> "Motor carrier operations must be bona fide and conducted in good faith, without a shadow of subterfuge or attempted evasion of the letter or obligation of the law. Any plan or scheme, whether by purported lease, agency, or other device disguising the true nature of the transportation will be of no avail for that purpose. Where one's object in the transportation of property on public highways is to earn compensation for the use of his equipment and his services, he cannot evade regulation by execution of leases or other agreements which purport to give the alleged lessee the status of a private carrier. * * *"

"* * * A plan or scheme which disguises the true nature of the transportation is of no avail * * *." *Interstate Commerce Commission v. Gannoe,* supra (100 F Sup at 794).

Thus, the lease executed with the witness Vinson as an ostensible lessee by the Company (and the only form offered by defendants) is of little consequence in our consideration if, after an examination of the Company's practices, it does, in fact, provide carrier services for hire.

Defendant stresses the proposition that the assumption of liability for safe carriage by the operator is the chief distinction between a carrier for hire and a lessor engaged in the private business of leasing motor vehicles for temporary use. We agree that a carrier normally assumes responsibility and control of the movement, whereas, a mere lessor of vehicles normally does not. The Company claims it did not in any way assume such responsibility for successful movement. Accordingly, it argues that it is to be treated as a lessor and not as a public carrier.

The answer to that contention is found in *Motor Haulage Co., Inc. v. United States,* 70 F Sup 17 (1947), affirmed 331 US 784, 67 S Ct 1205, 91 L ed 1815 (1946), where the problem was not unlike that of the case at bar. In that case, the self-styled lessor leased trucks and equipment on a mileage or time basis. He carried personal-injury and property-damage insurance, and, in many instances, he contracted without assuming responsibility. Often, he supplied drivers and paid their wages, compensation insurance, and social security taxes. The court held: "\* \* \* it cannot be fairly said that responsibility of the shipper is the sole test. \* \* \*" And further observed: "We see no inconsistency in a finding that plaintiff, even though without responsibility to the shipper, is still so far in control of the movement that it is engaged in transportation under the act. \* \* \*" (70 F Sup at 21-22). See, also, *Greyvan Storage, Inc. v. Dept. of Public Utilities,* 332 Mass 270, 127 NE2d 579 (1955); *Motor Haulage Co., Inc. v. Maltbie,* 293 NY 338, 57 NE2d 41, 161 ALR 401. Thus, it will be seen that the "responsibility" argument, standing alone, is wanting in merit.

In determining whether the lease is bonafide, one

of the prime considerations is whether the driver of the truck is in the employ and under the control and direction of the shipper rather than the would-be lessor. John J. Casale, Inc., Contract Carrier Application, 44 MCC 45 (1944).

Concerning such driver employment, *United States v. LaTuff Transfer Service, Inc.,* supra, says at page 381:

"Furnishing motor trucks to shippers with drivers selected and employed by the lessor has been * * * found to constitute the rendition of a motor truck transportation service subject to Commission regulation * * *."

■■ When the lessor furnishes equipment accompanied by its own drivers, it raises a rebuttable presumption of control of the movement by the lessor as it does in cases of a carrier for hire. *Motor Haulage Co., Inc. v. United States,* supra (70 F Sup at 21) ; *Interstate Commerce Commission v. Gannoe,* supra (100 F Sup at 793), citing John J. Casale, Inc., 44 MCC 45, supra; H. B. Church Truck Service Co., 27 MCC 191, supra; Shields Extension of Operations-Alliance, Ohio, 41 MCC 100. This presumption continues in absence of a clear showing that the lessee-shipper had "exclusive right and privilege of control." "In order for the operations to be those of the shipper as a private carrier there must be a clear and unequivocal showing that the shipper exercises control and responsibility over the operations of the vehicle, such as would be exercised by it if it were the owner of the vehicle. * * *" *Interstate Commerce Commission v. F. & F. Truck Leasing Co.,* supra (78 F Sup at 20). In *Motor Haulage Co., Inc. v. United States,* supra (70 F Sup 17), the presumption relative to employment of lessor's drivers is so strong that it almost attains the status

of a conclusive presumption as is indicated by the language of the opinion found at page 21, where the court says:

> "* * * The Commission * * * found that even when plaintiff turned the driver and truck over to a 'lessee' who then used that vehicle for its own purposes prescribing routes, there still remained a 'presumption' of control by the plaintiff which brought it within the category of a contract carrier. * * *"

The trial judge found that the Company furnished the drivers, paid their wages and social security taxes, and made the usual wage deductions. The record amply supports these findings. The evidence does not, however, demonstrate a "clear and unequivocal showing" that such drivers were other than those in the employ of defendant. The defendant Vinzce's testimony is extremely vague and evasive in this regard. Nor is it shown convincingly that Vinson (one of defendants' frequent "shippers") had complete control over the movements in question. Clearly then, the Company has failed to repel the presumption that it controlled the movement and warrants the conclusion that it must have been engaged in the business of transportation for hire under the shadow of "U-Drive" authority.

Turning now to the equally cogent and persuasive state authorities, we find, in most instances, that they construe statutes not unlike ORS 767.005(5) and 767.115. Notwithstanding some variations in statutory form from the Oregon code, the state decisions, as we have before observed, reflect the same general tenor of the federal cases and rely heavily upon the criteria established in those cases, and particularly upon the federal cases above cited.

Among the state cases in accord with the principles

set forth here and embodied in the preceding federal decisions are: *Reavley v. State,* 124 Tex Cir 528, 63 SW2d 709; *Roddy v. Hill Packing Co.,* 156 Kan 706, 137 P2d 215; *Public Service Commission v. Lloyd A. Fry Roofing Co.,* 219 Ark 553, 244 SW2d 147, affirmed 344 US 157, 73 S Ct 204, 94 L ed 521 (1949); *Robinson v. Woodard,* 227 Ark 102, 296 SW2d 672, cert. denied 353 US 988, 77 S Ct 1282, 1 L ed2d 1142 (1957); *Entremont v. Whitsell,* 13 Cal2d 290, 89 P2d 392 (1939); *Greyvan Storage v. Department of Public Utilities,* supra (127 NE2d 579); *Bruce's Juices, Inc. v. King,* 61 S2d 175 (Fla 1952), a case wherein the use of the owner's drivers was the sole criterion.

Our overall reaction to this problem and our answer here is adequately stated in the penetrating and oft-cited comment by U. S. Circuit Judge Hutcheson in the Georgia Truck System case, supra (123 F2d), where he says, at pp 211-212:

"We think it may not be doubted that if the evidence supports appellant's view that its business was confined to simply renting trucks for use by others, appellant would be right in its insistence that it was not engaged in transportation within the invoked act. We are equally without doubt however, that the evidence in this case affirmatively establishes that appellant's business is not so confined. On the contrary, though its operations have been to some extent invested with the form of a renting or hiring business, this investiture is but a device or subterfuge behind and under which appellant, in substance and in reality, operates a transportation business. It is true that the contracts, under cover of which the operations were conducted, are in most of their provisions carefully drawn to give color to appellant's claim of renting only, and if the operations had been conducted strictly within that form, there might have been

some question whether the operations so conducted were transportation operations within the invoked act. When, however, the contracts are read in the light of the construction accorded them by the parties by the actual operations under them, it is clear that the scheme as a whole is a mere subterfuge, an unpermitted evasion, not a real avoidance of the provisions of the law. In the argument much refinement was indulged in, much speculation was raised, many authorities cited, as to how close one might approach the line of transportation without being regarded as having stepped over it. We need not indulge here in any of these refinements. It is sufficient for us to say that the invoked statute is a highly remedial one, that its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of * * * transportation of property on the public highways for hire; * * *."

Affirmed.